# CENTRAL STATES, SOUTHEAST & SOUTHWEST AREAS PENSION FUND ET AL. *v.* CENTRAL TRANSPORT, INC., ET AL.

No. 82–2157.   Argued November 27, 1984—Decided June 19, 1985

560

MARSHALL, J., delivered the opinion of the Court, in which BRENNAN, WHITE, BLACKMUN, POWELL, and O'CONNOR, JJ., joined. STEVENS, J.,

filed an opinion concurring in part and dissenting in part, in which BURGER, C. J., and REHNQUIST, J., joined, *post*, p. 582.

*Russell N. Luplow* argued the cause for petitioners. With him on the briefs was *Diana L. S. Peters.*

*Joshua I. Schwartz* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were *Solicitor General Lee, Deputy Solicitor General Geller, Karen I. Ward,* and *Mary-Helen Mautner.*

*Patrick A. Moran* argued the cause for respondents. With him on the briefs were *Vivian B. Perry* and *Arthur R. Miller.**

JUSTICE MARSHALL delivered the opinion for the Court.

The issue presented is whether an employer who participates in a multiemployer benefit plan that is governed by the Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1001 *et seq.*, must allow the plan to conduct an audit involving the records of employees who the employer denies are participants in the plan.

I

A

Petitioners are two large multiemployer benefit plans, the Central States, Southeast and Southwest Areas Pension Fund and the Central States, Southeast and Southwest Areas Health and Welfare Fund (hereinafter referred to collectively as Central States).[1] Governed by § 302(c)(5) of

---

*Briefs of *amici curiae* urging reversal were filed for Arthur Young & Co. by *Carl D. Liggio;* for Bricklayers Fringe Benefit Funds—Metropolitan Area et al. by *Sheldon M. Meizlish;* and for the National Coordinating Committee for Multiemployer Plans by *Gerald M. Feder.*

*Brian G. Shannon* filed a brief for Deloitte Haskins & Sells as *amicus curiae* urging affirmance.

[1] As the Court of Appeals noted: "The record . . . indicates that the Funds are among the largest Taft-Hartley trust funds in the United States, that more than 13,000 employers participate and that they serve

the Labor Management Relations Act, 1947, 29 U. S. C. § 186(c)(5), and the Employee Retirement Income Security Act of 1974 (ERISA), 88 Stat. 829, 29 U. S. C. § 1001 *et seq.*, as amended by the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96–364, 94 Stat. 1208, these plans operate as trusts for the purpose of providing specified health, welfare, and pension benefits to employees performing work that is covered by collective-bargaining agreements negotiated by various affiliates of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (Teamsters).

Respondents (hereinafter referred to collectively as Central Transport) are 16 interstate trucking companies, each of which, either individually or through a multiemployer association, engages in collective bargaining with the Teamsters. Pursuant to that bargaining, each has become a signatory to the National Master Freight Agreement and supplemental, individual collective-bargaining agreements. Under these collective-bargaining agreements, each employer must make weekly contributions to Central States for each employee who performs work covered by the collective-bargaining agreements, and each employer agrees to be bound by the trust agreements that govern Central States.

Because the plans are so large—with thousands of participating employers—Central States relies principally on employer self-reporting to determine the extent of an employer's liability.[2]  Central States polices this self-reporting

---

more than 500,000 employees whose job classifications are covered in thousands of collective bargaining agreements." 698 F. 2d 802, 811 (CA6 1983). See also *Schneider Moving & Storage Co.* v. *Robbins,* 466 U. S. 364, 373, n. 16 (1984).

[2] The District Court described this system as follows:

"Traditionally, the Central States Funds have operated on a self-reporting basis, which required the employer to initially establish a base group of employees entitled to weekly contributions and then to inform [Central States] monthly of any fluctuations in the employment status of individuals covered by the collective bargaining agreement. Central

system by conducting random audits of the records of participating employers.

### B

On December 5, 1979, Central States contacted Central Transport to arrange an audit, which it described as part of a program of "'periodic reviews of participating employer contributions for the benefit of Plan Participants and their Beneficiaries.'" 522 F. Supp. 658, 662 (ED Mich. 1981). The audit was to take place at Central Transport's offices and was to encompass, among other subjects, the "'[d]etermination of eligible Plan Participants covered by Collective Bargaining Agreements.'" *Ibid.* Among the documents the auditors requested access to were payroll, tax, and other personnel records of those employees who the employer claimed were not plan participants.

Central States explained that access to these records would allow the auditors independently to determine the membership of the class entitled to participate in the plans, and thus to verify that Central Transport was making all required contributions.[3] Central Transport, however, insisted that 60% of its employees were not covered by the plans, and that Central States had no right to examine any records of noncovered employees. When Central Transport refused to allow the requested audit, Central States filed an action in Federal District Court seeking an "order permitting its auditors to conduct an independent verification of Central Transport's complete payroll records in order to determine

States relies upon the status reports of [Central Transport] to compute an invoice statement which it forwards to Central Transport. Thus, when the employer reports the termination or layoff of an individual formerly covered by the collective bargaining agreement, Central States will adjust its records and reduce the defendant's invoice to reflect the reported change. Conversely, when an employer reports the addition of new employees, Central States will increase the invoice by an amount which corresponds to the weekly contribution figure multiplied by the number of weekly hired employees." 522 F. Supp. 658, 662 (ED Mich. 1981).

[3] See *infra,* at 566–568.

whether the duties and status of each of its employees has been accurately reported by Central Transport." *Id.* at 660.[4]

The parties agreed that the facts of the case were not in dispute, and that the court should treat their pleadings as cross-motions for summary judgment. The District Court granted summary judgment in favor of Central States. After examining Central States' contractual relationship with Central Transport and Central States' responsibilities under ERISA, the court concluded that Central States had a right to conduct the requested audit. The audit was a reasonable means of "independently verify[ing] the status and duties of all individuals employed by Central Transport in order to insure that proper benefit contribution payments are being made." *Ibid.* The court thus ordered "that Central Transport provide to the audit representatives of Central States all of the documentation requested and that the audit procedure undertaken by Central States be allowed to continue." *Ibid.*[5]

The Court of Appeals for the Sixth Circuit reversed. 698 F. 2d 802 (1983). Interpreting the collective-bargaining agreements and trust documents in light of ERISA, the Court of Appeals held that Central States had to show "reasonable cause" to believe that a specific employee was covered by the plans before gaining a right of access to that employee's records. *Id.,* at 809–812. We granted certiorari, 467 U. S. 1250 (1984), and we now reverse the judgment of the Court of Appeals.

---

[4] The action was filed pursuant to § 301(a) of the Labor Management Relations Act, 1947, 29 U. S. C. § 185(a), and § 502 of ERISA, 29 U. S. C. § 1132.

[5] In reaching its decision, the District Court was "mindful of the fact that Central States ha[d] repeatedly stated that confidential payroll data [would] not be copied or removed from the Central Transport premises once the auditors have satisfied themselves that particular individuals are not performing [bargaining] unit work." 522 F. Supp., at 664.

## II

The documents governing Central Transport's contractual relationship with Central States include the collective-bargaining agreements between Central Transport and various affiliates of the Teamsters and the trust agreements of the Central States plans. Generally, the collective-bargaining agreements obligate Central Transport to participate in the Central States plans and to be bound by Central States' trust agreements. The trust agreements, which have been signed by Central Transport, govern the operation of the plans.

These trust documents include a number of provisions that are highly supportive of the right to audit claimed by Central States' trustees.

## A

We note first that the Pension Fund trust agreement[6] places on each participating employer the responsibility to make "continuing and prompt payments to the Trust Fund as required by the applicable collective bargaining agreement." App. to Pet. for Cert. A–44 (Art. III, § 1). The trustees are designated the recipients of all contributions and are "vested with all right, title and interest in and to such moneys." *Ibid.* (Art. III, § 3).

The agreement contains various specific and general grants of power to the trustees to enable them to administer the trusts properly. Most generally, the agreements authorize the trustees to "do all acts, whether or not expressly authorized . . . , which [they] may deem necessary or proper for the protection of the property held [under the trust agreement]." *Id.*, at A–47 (Art. IV, § 14(e)). The agreement also grants broad powers relating to the collection of employer contribu-

---

[6] The trust agreement governing the Pension Fund and the trust agreement governing the Health and Welfare Fund are identical in all pertinent respects. References will therefore be made only to the Pension Fund trust agreement.

tions, such as the power "to demand and collect the contributions of the Employers to the Fund," *id.*, at A–45 (Art. III, § 4), and the power to "take such steps . . . as the Trustees in their discretion deem in the best interest of the Fund to effectuate the collection or preservation of contributions . . . which may be owed to the Trust Fund." *Ibid.*

Among the more specific grants of trustee power is a power to demand and examine employer records:

> ".Production of Records—Each employer shall promptly furnish to the Trustees, upon reasonable demand the names and current addresses of its Employees, their Social Security numbers, the hours worked by each Employee and past industry employment history in its files and such other information as the Trustees may reasonably require in connection with the administration of the Trust. *The Trustees may, by their representatives, examine the pertinent records of each Employer at the Employer's place of business whenever such examination is deemed necessary or advisable by the Trustees in connection with the proper administration of the Trust.*" *Id.*, at A–46 (Art. III, § 5) (emphasis added).

## B

Central States' trustees interpret these provisions as authorizing random field audits like the one at issue in this case. In particular, they argue that the records of not-concededly-covered employees are "pertinent records" because their examination is a "proper" means of verifying that the employer has accurately determined the class of covered employees. The plans have a substantial interest in verifying the employer's determination of participant status, the trustees argue, because an employer's failure to report all those who perform bargaining unit work may prevent the plans from notifying participants and beneficiaries of their entitlements and obligations under the plans and may create

unfunded liabilities chargeable against the plans.[7]  More-
over, an employer has an incentive to underreport the num-
ber of employees covered, because such underreporting
would reduce his liability to the plans.

The reasonableness and propriety of the audit are con-
firmed, the trustees argue, by the accounting profession's
generally accepted auditing standards, which articulate the
elementary principle that for an auditor to verify a certain
selection decision, he must refer to a universe broader than
the selection itself:

> "When planning a particular sample, the auditor
> should consider the specific audit objective to be
> achieved and should determine that the audit procedure,
> or combination of procedures to be applied will achieve
> that objective.  The auditor should determine that the
> population from which he draws the sample is appropri-
> ate for the specific audit objective.  *For example, an
> auditor would not be able to detect understatements
> of an account due to omitted items by sampling the
> recorded items.  An appropriate sampling plan for
> detecting such understatements would involve selecting
> from a source in which the omitted items are included.*"
> American Institute of Certified Public Accountants,
> Codification of Statements on Auditing Standards, AU
> § 350.17, p. 223 (1985) (emphasis added).

---

[7] The consistent view of the Secretary of Labor is that, under ERISA's
minimum participation, vesting, and benefit accrual standards for pension
plans, 29 U. S. C. §§ 1052, 1053, 1054, a pension plan covered by ERISA
*must* award credit "solely on the basis of service performed for a par-
ticipating employer, regardless [of] whether that employer is required to
contribute for such service or has made or defaulted on his required con-
tributions."  In the Secretary's judgment, "[a]ny plan term or Trustees'
resolution to the contrary is . . . unlawful and unenforceable."  Depart-
ment of Labor Advisory Op. No. 76–89 (Aug. 31, 1976) (reprinted in App.
to Pet. for Cert. A70–A71); accord, Department of Labor Advisory Op.
No. 78–28A (Dec. 5, 1978) (reprinted in App. to Pet. for Cert. A71–A74).

The trustees' determination that the trust documents authorize their access to the records here in dispute has significant weight, for the trust agreement explicitly provides that "any construction [of the agreement's provisions] adopted by the Trustees in good faith shall be binding upon the Union, Employees and Employers." App. to Pet. for Cert. A–48 (Art. IV, § 17).[8] There has been no evidence of a bad-faith motive behind the trustees' determination of the scope of their powers under the trust agreement or behind their determination of the auditing program's propriety. The trustees assert that the requested audit is highly relevant to the trust's legitimate interests, and this assertion fully conforms to generally accepted auditing standards. Thus, if our inquiry were merely an inquiry into the trust agreement, the trustees' right to conduct the audit in question would seem clear.

### III

The Court of Appeals, nonetheless, rejected the Central States trustees' interpretation of their contractual power. In the court's view, such an auditing power would be unreasonable in light of the policies and protections embodied in ERISA. We agree with the Court of Appeals that trust documents cannot excuse trustees from their duties under ERISA, and that trust documents must generally be construed in light of ERISA's policies, see 29 U. S. C. § 1104(a)(1)(D), but we find no inherent inconsistency between ERISA and the interpretation of the trust agreement offered by the Central States trustees. Indeed, we find the

---

[8] Similarly, the collective-bargaining agreement provides that each employer is deemed to have "ratif[ied] all action already taken or to be taken by [Trustees] within the scope of their authority." 522 F. Supp., at 661 (quoting National Master Freight Agreement, Art. 60). A trust "participation agreement" entered into by Central Transport is of similar effect, providing that Central Transport "assent[s] to . . . all of the actions of the Trustees in administering such Trust Fund in accordance with the Trust Agreement and rules adopted." Ibid. (quoting paragraph one of the Pension Fund participation agreement).

trustees' interpretation of their documents to be entirely reasonable in light of ERISA's policies.

An examination of the duties of plan trustees under ERISA, and under the common law of trusts upon which ERISA's duties are based, makes clear that the requested audit is highly relevant to legitimate trustee concerns.

## A

This Court has on a number of occasions discussed the policy concerns behind ERISA. In *Nachman Corp.* v. *Pension Benefit Guaranty Corp.*, 446 U. S. 359, 361 (1980), we noted that Congress enacted ERISA after "almost a decade of studying the Nation's private pension plans" and other employee benefit plans.[9] Congress found that there had been a "rapid and substantial" growth in the "size, scope, and numbers" of employee benefit plans and that "the continued well-being and security of millions of employees and their dependents are directly affected by these plans." 29 U. S. C. § 1001(a). But it also recognized that "owing to the inadequacy of [pre-ERISA] minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may [have been] endangered." *Ibid.* We have recognized that one of ERISA's principal purposes was "to correct this condition by making sure that if a worker has been promised a defined pension benefit upon retirement— and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it." 446

---

[9] Although most of ERISA's legislative history focused on pension plans, Congress also studied the operation of other employee benefit plans and developed a similar regulatory framework respecting these other plans. For example, ERISA's rules concerning reporting, disclosure, and fiduciary responsibility apply to all employee benefit plans. See 29 U. S. C. §§ 1021–1031, 1101–1114. See also 29 U. S. C. § 1001(a) (stating congressional findings and policies with respect to "employee benefit plans"); 29 U. S. C. § 1002(3) (defining "employee benefit plan" as including both "pension benefit plan[s]" and "welfare benefit plan[s]"). See generally *Shaw* v. *Delta Air Lines, Inc.*, 463 U. S. 85, 91 (1983).

U. S., at 375. One of the methods of accomplishing this was the provision of "minimum standards" that would "assur[e] the equitable character of [employee benefit plans] and their financial soundness." 29 U. S. C. § 1001(a).

## B

In general, trustees' responsibilities and powers under ERISA reflect Congress' policy of "assuring the equitable character" of the plans. Thus, rather than explicitly enumerating *all* of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility.[10] Under the common law of trusts, as under the Central States trust agreements, trustees are understood to have all "such powers as are necessary or appropriate for the carrying out of the purposes of the trust." 3 A. Scott, Law of Trusts § 186, p. 1496 (3d ed. 1967) (hereinafter Scott).[11]

The manner in which trustee powers may be exercised, however, is further defined in the statute through the provision of strict standards of trustee conduct, also derived from the common law of trusts—most prominently, a standard of loyalty and a standard of care. Under the former, a plan

---

[10] See, *e. g.*, 29 U. S. C. § 1103(a) ("assets of an employee benefit plan shall be held in trust"); S. Rep. No. 93–127, p. 29 (1973) ("The fiduciary responsibility section, in essence, codifies and makes applicable to these fiduciaries certain principles developed in the evolution of the law of trusts"); H. R. Rep. No. 93–533, p. 11 (1973) (identical language); cf. *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 329–334 (1981) (Congress intended that union welfare funds regulated by the Taft-Hartley Act, see 29 U. S. C. § 186(c)(5), be operated under traditional trust law principles, and this desire became explicit in ERISA).

[11] Accord, G. Bogert & G. Bogert, Law of Trusts and Trustees § 551, p. 41 (2d rev. ed. 1980) (hereinafter Bogert) (trustee has the power to use all "ordinary and natural means" for accomplishing the trust's objective); Restatement (Second) of Trusts § 186(b) (1959) (hereinafter Restatement) (trustee has all powers "necessary or appropriate to carry out the purposes of the trust").

fiduciary "shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . for the exclusive purpose of providing benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." 29 U. S. C. § 1104(a)(1)(A). See also § 1103(c)(1); cf. § 186(c)(5). Under the latter, a fiduciary "shall discharge his duties with respect to a plan . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." § 1104(a)(1)(B).[12]

An examination of the structure of ERISA in light of the particular duties and powers of trustees under the common law leaves no doubt as to the validity and weight of the audit goals on which Central States relies. ERISA clearly assumes that trustees will act to ensure that a plan receives all funds to which it is entitled, so that those funds can be used on behalf of participants and beneficiaries, and that trustees

---

[12] In light of ERISA's standards, Central Transport correctly argues that the audit request would be illegitimate under the standard of loyalty if it were actually an effort by plan trustees to expand plan coverage beyond the class defined in the plans' terms or to acquire information about the employers to advance union goals. It similarly argues that the audit would be imprudent if it were clearly wasteful of plan assets or unrelated to legitimate plan concerns.

Central Transport, however, has submitted no evidence that Central States' audit program's actual goal was to expand the trust's coverage beyond that provided in the applicable collective-bargaining agreements or to acquire information for union goals; nor did it submit any evidence that the audits were unjustifiably costly. Thus, whether the auditing power claimed by Central States is consistent with ERISA must be analyzed in terms of the goal upon which Central States has rested its audit, that of policing Central Transport's " '[d]etermination of eligible Plan Participants covered by Collective Bargaining Agreements,' " 522 F. Supp., at 662 (quoting Central States' letter to Central Transport), so as to verify that Central Transport is indeed contributing all required amounts on behalf of all covered employees.

will take steps to identify all participants and beneficiaries, so that the trustees can make them aware of their status and rights under the trust's terms.

## C

One of the fundamental common-law duties of a trustee is to preserve and maintain trust assets, Bogert § 582, at 346, and this encompasses "determin[ing] exactly what property forms the subject-matter of the trust [and] who are the beneficiaries." *Id.* § 583, at 348 (footnotes omitted). The trustee is thus expected to "use reasonable diligence to discover the location of the trust property and to take control of it without unnecessary delay." *Id.*, at 355.[13] A trustee is similarly expected to "investigate the identity of the beneficiary when the trust documents do not clearly fix such party" and to "notify the beneficiaries under the trust of the gifts made to them." *Id.*, at 348–349, n. 40.

The provisions of ERISA make clear that a benefit plan trustee is similarly subject to these responsibilities, not only as a result of the general fiduciary standards of loyalty and care, borrowed as they are from the common law, but also as a result of more specific trustee duties itemized in the Act. For example, the Act's minimum reporting and disclosure standards require benefit plans to furnish all participants with various documents informing them of their rights and obligations under the plan, see, *e. g.*, 29 U. S. C. §§ 1021, 1022, 1024(b),[14] a task that would certainly include the duty of determining who is in fact a plan participant.[15] The Act also

---

[13] See also Bogert 355 (where the settlor retains possession of trust assets, "the trustee must hold the settlor to [his] obligation"); 2 Scott § 175, at 1415 ("trustee is under a duty to take such steps as are reasonable to secure control of the trust property and to keep control of it").

[14] See also 29 CFR §§ 2520.104b–1—2520.104b–30 (1984).

[15] That the reporting requirements presuppose a plan's knowledge of participants' identities is highlighted by the Labor Department's determination that to comply with the minimum reporting standards a plan "must [send the prescribed material] by a method or methods of delivery

requires that a benefit plan prevent participant employers from gaining even temporary use of assets to which the plan is entitled, see § 1106(a)(1)(B) (prohibiting trustees from "caus[ing] the plan to engage in a transaction, if . . . such transaction constitutes a direct or indirect . . . extension of credit" to a participating employer), a requirement that would certainly create a trustee responsibility for assuring full and prompt collection of contributions owed to the plan.[16]

Moreover, that these trustee duties support the auditing authority claimed in this case is strongly suggested by the other provisions of ERISA as well as by the positions of the administrative agencies charged with the administration of the Act. For example, § 209 of the Act supplements the benefit plans' duties to furnish reports to plan participants by requiring employers to maintain records on employees and to furnish to benefit plans the information needed for the plans' fulfillment of their reporting duties. 29 U. S. C. § 1059. The Secretary of Labor has explicitly interpreted the trustees' duty to prevent employer use of trust assets as creating a plan duty to verify employer determinations and requiring plans to adopt systems for policing employers. And the Secretary has endorsed the appropriateness of field auditing programs for this purpose. Thus, the Secretary notes that "many multiple employer plans have adopted written procedures for the orderly collection of delinquent employer contributions which involve reasonable, diligent and systematic

---

likely to result in full distribution." 29 CFR § 2520.104b–1 (1984). Mail distribution is one of the suggested methods, and more importantly, the Department cautions that "in no case is it acceptable [for a plan] merely to place copies of the material in a location frequented by participants" as a means of complying with ERISA's reporting requirements). *Ibid.*

[16] See also 29 U. S. C. § 1103(c)(1) (providing that "the assets of a plan shall never inure to the benefit of any employer"); § 1145 (requiring employers to fulfill the contribution obligations in accordance with the terms of plan documents). For a more detailed discussion of Congress' concern for assuring full and prompt compliance with contribution obligations, see Part IV–C, *infra.*

methods for the review of employer contribution accounts by means of, for example, . . . field audits." In the Department's view, plans "which do not establish and implement [such] collection procedures" may "by failing to collect delinquent contributions" be found to have violated § 406's prohibition of extensions of credit to employers. Prohibited Transaction Exemption 76–1, 41 Fed. Reg. 12740, 12741 (1976); accord, Department of Labor Advisory Op. No. 78–28A (Dec. 5, 1978) (reprinted in App. to Pet. for Cert. A71–A74).

In light of the general policies behind ERISA as well as the particular provisions of the statute, we can only conclude that there is no conflict between ERISA and those concerns offered by Central States to justify its audit program. Both the concern for fully informing participants of their rights and status under a plan and the concern for assuring the financial integrity of the plans by determining the class of potential benefit claimants and holding employers to the full and prompt fulfillment of their contribution obligations are proper and weighty within the framework of ERISA.

## IV

The Court of Appeals offered a number of reasons why the requested audit would nevertheless be improper as a matter of law. The Court of Appeals largely relied on the presence of alternative means of protecting a plan's interests to conclude that a plan's access to employee records could safely be limited to those instances where a plan shows "reasonable cause" to believe that a specific employee is a participant. The court speculated that "[t]he Funds enjoy a number of protections against being called upon to dispense benefits to a participant on whose behalf no contributions or insufficient contributions were made," 698 F. 2d, at 813, that the plans thus did not need primarily to rely on its own monitoring to safeguard its interests, and that therefore "the possibility of

liability . . . on the part of . . . the Funds [could] not justify the broad audit [the trustees] seek." *Ibid.*

## A

The Court of Appeals first noted that employer contributions could effectively be policed by interested unions or by the Secretary of Labor, thus diminishing the trustees' interests in independently monitoring employer compliance. Moreover, in the court's view, a plan's reliance on union or Government oversight of an employer's contributions would be more consistent with federal policies in the pension and labor fields than would be a plan's reliance on the sort of audit at issue here.

### (1)

The notion that federal policy favors union enforcement of an employer's collectively bargained obligations to a benefit plan, to the exclusion of enforcement by the plan's trustees, simply did not survive last Term's decision in *Schneider Moving & Storage Co. v. Robbins,* 466 U. S. 364 (1984). In *Schneider,* we held that a benefit plan could bring an independent action for judicial enforcement of an employer's trust obligations, and we in large part relied on the proposition that there was no federal policy favoring trustee dependence on a union's use of a grievance and arbitration system for such enforcement.[17]

Of greatest significance here is this Court's conclusion that compelling benefit plans to rely on unions would erode the protections ERISA assures to beneficiaries, for the diminishment of trustee responsibility that would result would not necessarily be made up for by the union. ERISA places strict duties on trustees with respect to the interests of

---

[17] The benefit plans involved in *Schneider* were the same plans that are petitioners here, and the trust agreements at issue in *Schneider* are also the same as those here.

beneficiaries, and unions' duties toward beneficiaries are of a quite different scope.

A trustee's duty extends to all participants and beneficiaries of a multiemployer plan, while a local union's duty is confined to current employees employed in the bargaining unit in which it has representational rights. The breadth of the trustee's duty may result in a very different view of the special situations that may exist in any single unit, and, as we recognized in *Schneider*, a union's arrangements with a particular employer might compromise the broader interests of the plan as a whole:

> "These are multiemployer trust funds. Each of the participating unions and employers has an interest in the prompt collection of the proper contribution from each employer. Any diminution of the fund caused by the arbitration requirements of a particular employer's collective-bargaining agreement would have an adverse effect on the other participants." 466 U. S., at 373 (footnotes omitted).

See also *Lewis* v. *Benedict Coal Co.*, 361 U. S. 459, 469 (1960). See generally *Schneider, supra*, at 376, n. 22 (the union's duty "runs only to the members of its collective-bargaining unit, and is coextensive with its statutory authority to act as the exclusive representative for all the employees within the unit").[18]

Similarly, a local union's duties to bargaining-unit workers is a general duty to act in the group's interests regarding the overall terms and conditions of employment. The trustees'

---

[18] This potential conflict was also discussed in *Chemical & Alkali Workers* v. *Pittsburgh Plate Glass Co.*, 404 U. S. 157, 171–175 (1971), where we recognized that the interests of retirees may substantially conflict with the interests of active workers. Because of the potential conflicts, we held that retirees cannot be considered part of a collective-bargaining unit represented by a union and that retirees' benefits are not within the mandatory subjects of union-employer collective bargaining. Retirees, as beneficiaries of a pension plan, clearly are within the class to whom trustees owe a duty.

duty, in contrast, is to provide specific benefits to those who are entitled to them in accordance with the terms of a plan. That the general nature of a union's duty may result in less than full protection to individual entitlements has been well recognized in our cases, and we have accordingly refrained from making enforcement of such entitlements rest primarily on union action. See *Barrentine* v. *Arkansas-Best Freight System, Inc.*, 450 U. S. 728, 742 (1981) (union goal of maximizing overall compensation for the bargaining unit as a whole may prevent it from effectively policing employer's payment to each employee of statutory minimum wages). In *Schneider*, we recognized that in the context of ERISA primary reliance on unions would allow "wide discretion and would provide only limited protection," 466 U. S., at 376, n. 22, to those participant and beneficiary rights that the statute was designed to ensure:

> "A primary union objective is 'to maximize overall compensation of its members.' Thus, it may sacrifice particular elements of the compensation package 'if an alternative expenditure of resources would result in increased benefits for workers in the bargaining unit as a whole.'" *Ibid.* (citation omitted).

See also *NLRB* v. *Amax Coal Co.*, 453 U. S. 322, 336 (1981) ("The atmosphere in which employee benefit trust fund fiduciaries must operate, as mandated by [29 U. S. C. § 186(c)(5)] and ERISA, is wholly inconsistent with th[e] process of compromise and economic pressure [that characterizes collective bargaining]").

The rationale in *Schneider* and our other cases in this area thus precludes a holding that a benefit plan must primarily rely on union monitoring of an employer's compliance with its trust obligations.[19]

---

[19] In *Schneider* we not only concluded that compelling benefit plan reliance on union enforcement of trust obligations would have significant costs to the protections of ERISA, but we also concluded that compelling such reliance would produce few benefits in terms of federal labor policies. For

(2)

There are also compelling reasons why the Department of Labor's power to police employer compliance must be rejected as an alternative to audits by the plans themselves. Indeed, the structure of ERISA makes clear that Congress did not intend for Government enforcement powers to lessen the responsibilities of plan fiduciaries.

First, the Department of Labor denies that it has the resources for policing the day-to-day operations of each multiemployer benefit plan in the Nation. The United States, as *amicus*, informs us that approximately 900,000 benefit plans file annual reports with the Secretary of Labor, and that between 11,000 and 12,000 of these are multiemployer plans. As the petitioners' situations illustrate, some multiemployer plans can be quite large. See n. 1, *supra*. It is therefore not surprising that the United States argues that "[i]t is thus wholly unrealistic to suggest that centralizing all auditing authority in the Secretary would provide protection to benefit plan participants comparable to that afforded by trustee audits." Brief for United States as *Amicus Curiae* 20, n. 11.

Second, although ERISA grants the Secretary of Labor broad investigatory powers, see, *e. g.,* 29 U. S. C. § 1134, neither the structure of the Act nor the legislative history shows any congressional intent that plans should rely primarily on centralized federal monitoring of employer contribution requirements. Indeed, Congress expressly withheld from the Secretary the authority to initiate actions to enforce an employer's contribution obligations. See 29 U. S. C. §§ 1132(b)(2), 1145. In contrast, as we have noted, trustees

example, such policies as the presumption in favor of arbitrability derive in large part from the desire to promote alternatives to strikes, lockouts, and other exercises of economic power. But that goal has little relevance to the field of trust administration, where disputes between plans and participating employers do not normally have such results. 466 U. S., at 372, and n. 13.

were given the authority to sue to enforce an employer's obligations to a plan. § 1132.

## B

The Court of Appeals also challenged Central States' need for the audit because of the likelihood that covered employees would themselves come forward to assure that employers are making required contributions on their behalf. The court emphasized that participants could become aware of their status through the Act's reporting provisions. 698 F. 2d, at 813 (citing 29 U. S. C. § 1021). But although the reporting requirements are designed to assure that participants receive information about their status and rights, they do so by placing a reporting duty *on the plans*. Thus, to give participants initial notice of their status, the plans need to know the identities of participants. See nn. 14, 15, *supra*, and accompanying text. That is, of course, precisely the information that Central States sought to verify in its requested audit.[20]

---

[20] The Court of Appeals also questioned the importance of the audit's goal, speculating that the plan might simply be able to deny benefit claims of participants who had been notified of their status through the reporting requirement but had nevertheless taken no action to assure that their employers properly contributed on their behalf. 698 F. 2d, at 813. Obviously, this "estoppel argument" has the same flaw as the argument that a participant, once notified of his status, will come forward to identify himself: Before the plan can notify a participant of his status, it must have identified him, and such identification was the purpose of the requested ·audit.

In addition, however, the argument has other major problems. First, we note that the Labor Department has consistently taken the position that any pension plan document language denying benefits to a participant because of an employer's failure to make required contributions would violate ERISA and would thus be unenforceable. See n. 7, *supra*. At a minimum, this means that Central States is reasonable in operating its audit program under the assumption that it would be liable for pension claims regardless of an employer's failure to make required contributions. Second, the Court of Appeals did not contend that the reports Central States sends to participants inform them of a burden of verifying their

## C

The Court of Appeals' remaining reason for questioning Central States' interest in the audit focused on the fact that a benefit plan would have an action against a delinquent employer should any benefit claims ever be made by a participant who had never been the subject of contributions. We reject the notion that the plan's ultimate ability to remedy an employer's breach of its obligations forecloses the plan from seeking to deter such breaches or to discover them early. Such a suggestion ignores the trustees' fiduciary duty to inform participants and beneficiaries of their rights, to gain immediate use of trust assets for the benefit of the trust, to avoid the time and expense of litigation, and to avoid unfunded liabilities that might eventually prove uncollectable as a result of insolvencies. For a plan passively to allow an employer to create such unfunded liabilities would jeopardize the participants' and beneficiaries' interests as well as those of all participating employers who properly comply with their obligations. See *Schneider*, 466 U. S., at 373, and n. 17.

The Court of Appeals' argument obviously conflicts with one of the principal congressional concerns motivating the passage of the Act, that plans should assure themselves of adequate funding by promptly collecting employer contributions.[21] In ERISA, Congress sought to create a pension system in which "[a]ll current accruals of benefits based on current service . . . [would] be paid for immediately." H. R. Rep. No. 93–533, p. 14 (1973). See generally 29 U. S. C. § 1082. As the Reports accompanying the bills declared:

> "The pension plan which offers full protection to its employees is one which is funded with accumulated assets which at least are equal to the accrued liabilities,

employer's contributions, or that the plan documents deny benefits on the basis of an employer's failure to make proper contributions. Thus, even if ERISA allowed a plan to operate in one of these manners, there has been no finding that the plans at issue here have done so.

[21] See Part III–C, *supra*.

and with a contribution rate sufficient to maintain that status at all times." *Id.*, at 7; S. Rep. No. 93–127, pp. 9–10 (1973) (identical language).[22]

## V

Given Congress' vision of the proper administration of employee benefit plans under ERISA, we have little difficulty holding that the audit requested by Central States is well within the authority of the trustees as outlined in the trust documents. But we should also specify what we do not hold. First, we do not hold that under ERISA a benefit plan's interests in fully identifying participants and beneficiaries *require* that it conduct the sort of audit in question. This case involves only the trustees' *right* to conduct this particular kind of audit program, not their *duty* to do so. Second, we have no occasion to determine whether ERISA would independently confer on the trustees a right to perform the sort of audit demanded in this case in the face of trust documents that explicitly limit the audit powers of trustees. Cf. 29

---

[22] In the floor debate on the Multiemployer Pension Plan Amendments Act of 1980, Pub. L. 96–364, 94 Stat. 1208, which amended ERISA to further protect the funding of multiemployer plans, one of the floor managers explained the problems some employers create for multiemployer plans by not fully and promptly complying with their contribution obligations:

"Failure of employers to make promised contributions in a timely fashion imposes a variety of costs on plans. While contributions remain unpaid, the plan loses the benefit of investment income that could have been earned if the past due amounts had been received and invested on time. Moreover, additional administrative costs are incurred in detecting and collecting delinquencies. Attorneys' fees and other legal costs arise in connection with collection efforts.

"These costs detract from the ability of plans to formulate or meet funding standards and adversely affect the financial health of plans. Participants and beneficiaries of plans as well as employers who honor their obligation to contribute in a timely fashion bear the heavier cost of delinquencies in the form of lower benefits and higher contribution rates. Moreover, . . . uncollected delinquencies can add to the unfunded liability for all employers." 126 Cong. Rec. 23039 (1980) (statement of Rep. Thompson).

U. S. C. § 1104(a)(1)(D). Last, we have no occasion in this case to analyze what sort of factual showing would be necessary to a claim that a particular auditing program was being conducted in a manner that violated ERISA's fiduciary duties of loyalty or care. Although we do not question the proposition that the auditing powers of a benefit plan are limited to prudent actions furthering the legitimate purposes of the plan, there is no reason in ERISA or the plan documents of this case why the kind of audit requested here should, as a matter of law, be considered outside the scope of proper plan administration.[23]

The judgment of the Court of Appeals is accordingly reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, concurring in part and dissenting in part.

If an employer who participates in a multiemployer benefit plan enters into an agreement that authorizes the trustees of the plan to conduct an audit of the employer's personnel records, such an agreement is not prohibited by ERISA. That is the proposition of law that I understand the Court to announce today and I agree with it.

---

[23] We note that in this case Central States has agreed to various limits on its audit so as not to exceed what would be reasonably appropriate for the service of the audit's legitimate purposes. See n. 5, *supra.* Central States does not dispute that its right to demand access to employer records does not reach beyond what is appropriate for the proper administration of the plans, and, of course, a court ordering an employer to comply with a particular audit demand could, upon a proper showing by the employer, limit the auditors accordingly. Cf. *Central States, Southeast and Southwest Areas Pension Fund* v. *Theut Products,* Civ. No. 82–71080 (ED Mich., Oct. 21, 1982) (Cohn, J.) (reprinted in App. to Pet. for Cert. A–96) (ordering an employer to comply with a benefit plan's audit request but allowing the employer to withhold specific information that was not relevant to the audit's purposes and allowing the employer to restrict the auditors' ability to copy or disclose information where the auditors' did not need to do so).

In my opinion, the right to conduct an audit of the kind involved in this case must be granted by contract; it is not conferred by ERISA itself. My disagreement with the Court is based on our differing interpretations of the particular contract documents in this case.

The Pension Fund trust agreements, as the Court accurately quotes, provide that "each Employer shall promptly furnish to the Trustees, upon reasonable demand" information concerning "its Employees." App. to Pet. for Cert. A–46. The term "Employees," however, the first letter of which is capitalized in the trust agreements, does not comprise *all* employees of respondents. Instead, Article I, § 3, expressly provides that "[t]he term 'Employee' as used herein shall include," in pertinent part, persons who are both employed pursuant to the collective-bargaining agreement *and* covered by the pension plan. *Id.*, at A–43.\* Thus, the trustees have power to audit personnel records only of *covered* employees.

Nor do the trust agreements require this Court to acquiesce in the trustees' understandable assertion of power to investigate whatever personnel records they deem necessary. It is true that Article IV provides that interpretations of the trust agreements adopted by a majority of the trustees "in good faith shall be binding upon the Union, Employees and Employers." *Id.*, at A–48. But as the Court of Appeals pointed out, this broad language "does not . . . give the trustees *carte blanche* powers to undertake an audit of the records of all of [respondents'] employees. They are limited in their discretion by . . . the common law concept that a trustee may only act within the scope of his or her authority." 698 F. 2d 802, 810 (1983).

---

\*The general language italicized by the Court, *ante,* at 566, in context authorizes audits of records in addition to those specifically listed, but only as to *covered* employees. If the language were construed to encompass records of noncovered employees, the limitations in the preceding sentence of the trust agreements would be read out of the contract.

In sum, although I acknowledge that the provisions of those documents that the Court has quoted lend support to its conclusion, I find the painstaking and accurate analysis of the complete set of documents in Judge Kennedy's opinion for the Court of Appeals far more persuasive. See *id.*, at 806–810. Because the dispute over the meaning of these particular documents is not a matter of special public interest, I simply record my agreement with the Court of Appeals' interpretation of the contract. To that extent, I respectfully dissent.