WIENER, Circuit Judge,
specially concurring.
I fully recognize that, inasmuch as I am concurring in Judge Smith’s typically well-crafted opinion for the panel in this case, affirming the equally well-crafted opinion of the district court, I run the risk of gilding the proverbial lily when I write separately. I do so nonetheless in the hope of adding a bit of perspective to the situation and thereby bolstering further this court’s position in the instant appeal. I am satisfied that when the instant case is viewed in the framework of the purposes for which multiemployer plans are created, the types of workers and types of industries which such plans are generally intended to serve, and certain overarching features of ERISA, such as its “Type of Benefit Coverage” provision and its ‘Written Instrument” requirement, our ruling today will be seen not solely as the product of a fair reading of the plain language of the statute “in a vacuum,” but more broadly as a fair and sensible determination that is wholly consistent with the goals and purposes of ERISA in general and multiemployer plans in particular.
I
PLAIN LANGUAGE REVISITED
First, I would re-emphasize the point that ERISA’s “Type of Benefit Coverage” provision does not require AppleTree as an employer participating in a multiemployer welfare benefit plan, to provide COBRA benefits to those of AppleTree’s former employees and their dependents who had been receiving, or became eligible to receive, COBRA coverage under the UFCW prior to September 1, 1992 (“SCP Qualified Beneficiaries”). Section 602(1) of ERISA[4] provides:
(1) The coverage must consist of coverage which, as of the time the coverage is being provided, is identical to the coverage provided under the plan to simi *976 larly situated beneficiaries under the plan with respect to whom a qualifying event has not occurred. If coverage is modified under the plan for any group of similarly situated beneficiaries, such coverage shall also be modified in the same manner for all individuals who are qualified beneficiaries under the plan pursuant to this part in connection with such group.[5]
In applying § 602(1) to the instant case, UFCW’s joint board (the “Board”) — the designated plan sponsor — interprets the term “similarly situated beneficiaries under the plan for whom a qualifying event has not occurred” to mean AppleTree’s employees. But the Board’s interpretation ignores the unambiguous wording of the statute which specifies that similarly situated beneficiaries are those beneficiaries who are participating in the same plan as the COBRA qualified beneficiaries.
Section 602(1) describes the “type of benefit coverage” to be provided to COBRA qualified beneficiaries under a plan. Specifically, § 602(1) requires the plan sponsor to provide identical health care coverage to the COBRA qualified beneficiaries of the plan as is provided to other persons who are “similarly situated” to them and who are participating in the same plan. To achieve this objective, § 602(1) also requires that if the plan sponsor modifies coverage for such “similarly situated” persons, it must also modify the coverage for COBRA qualified beneficiaries in the same manner. Correctly applying the above quoted language of the statute, no support can be discerned for the Board’s interpretation that individuals become “similarly situated” to COBRA qualified beneficiaries of one plan when the individuals participate in another plan. Instead, the language of § 602(1) demonstrates that the intent of Congress was to prohibit plan sponsors from discriminating between COBRA qualified beneficiaries and active employees who are participating in the same plan.
Further, the plain language of the statute does not support the Board’s contention that AppleTree — a formerly participating employer — somehow caused a modification of the coverage within the meaning of § 602(1) when it sponsored its own group health plan for its employees after the SCP Qualified Beneficiaries became eligible for and began to receive COBRA coverage under the UFCW. The statute refers to a modification of coverage under the same plan. The language of § 602(1) reflects that the intent of Congress was to prohibit a plan sponsor from modifying coverage to provide coverage to COBRA qualified beneficiaries different from the coverage provided to “similarly situated” active employees of the same plan. Nothing in § 602(1) requires an entity that has never sponsored health care coverage for an individual to provide COBRA benefits for that individual simply because the entity happened to have been his employer when he experienced a COBRA qualifying event under a multiemployer plan and the entity subsequently establishes a group health plan for its own employees. The majority opinion makes this abundantly clear.
To reach a different conclusion would not only ignore the plain language of the statute but would also fail to recognize the purpose and structure of multiemployer plans.
The primary purpose of multiemployer plans is to provide benefits to workers of a particular industry or area. Through this structure, the workers are able to continue their coverage under .the plan despite moving from one employer to another — a phenomenon typical of certain industries, including retail food sales and service — within the group of employers participating in the plan. To terminate an individual’s COBRA coverage under a multiemployer plan just because he happened to work for one particular employer among the many at the time he became eligible to receive COBRA benefits under the plan would fly ■ in the face of a principal purpose of multiemployer plans. More about this later. Applying the foregoing principles, § 602(1) would be applicable in the instant case if — -but only if — the Board modified the coverage of the active employees and their dependents who are participating in the UFCW and who are similarly situated beneficiaries with respect to the *977 SCP Qualified Beneficiaries. Here, no such modification of coverage occurred. Accordingly, § 602(1) is inapplicable and does not relieve the Board of its obligation to provide COBRA coverage to the SCP Qualified Beneficiaries; neither can § 602(1) be stretched to shift such obligation to AppleTree.
' II
DEFINITION OF PLAN SPONSOR
ERISA’s “definition of plan sponsor” actually prohibits AppleTree from replacing the Board as plan sponsor of the SCP Qualified Beneficiaries, absent some express written provision to that effect in the UFCW or its plan documents. Nevertheless, as amicus, the National Coordinating Committee for Multiemployer Plans (“NCCMP”) insists, on behalf of the Board, that AppleTree was required to reheve the Board of its COBRA obligations on August 31, 1992. I disagree.
Recognizing as it must that COBRA requires the “plan sponsor” to provide COBRA coverage, NCCMP proceeds to argue that AppleTree “established and maintained” the UFCW by making contributions thereto; and that as a result when AppleTree ceased contributing to the UFCW and established a group health plan for its employees on September 1, 1992, the Board ceased to be the plan sponsor as to AppleTree’s former and active employees, and the duty of providing COBRA benefits reverted to AppleTree as plan sponsor of those individuals on that date. On the basis of that bit of legal legerdemain, NCCMP concludes that AppleTree is the party responsible for providing the SCP Qualified Beneficiaries with COBRA coverage as of September 1, 1992.
This contention, however, finds no support in the statute, the plan documents, or reality. ERISA provides the specific statutory definition of “plan sponsor”: Multiemployer plans have only one plan sponsor, the joint board of trustees. Changes in the identity of employers who from time to time participate in the plan have no effect on the party designated by ERISA to be the “plan sponsor.” The joint board of trustees remains the “plan sponsor” regardless of which employers are permitted to withdraw from (or join) the plan.
Ill
THE MULTIEMPLOYER PENSION PLAN AMENDMENT ACT — A COMPARISON
Indirect but strong support for the conclusion that withdrawal of an employer from a multiemployer welfare benefit plan does not change the party designated as plan sponsor is found in the adoption by Congress of the Multiemployer Pension Plan Amendment Act of 1980 (“MPPA”). Congress enacted the MPPA in response to concerns about the extreme financial hardships of multiemployer pension plans (as distinguished from mul-tiemployer welfare benefit plans) and the resulting potential liability of the Pension Benefit Guaranty Corporation to pay for certain unfunded pension benefits. These concerns arose because of the tension between the plan sponsors on the one hand and the contributing employers of multiemployer pension plans on the other — tension resulting from the disparate identities and interests of those parties.
In response to those concerns, Congress elected not to redesignate the plan sponsor of a multiemployer pension plan upon the withdrawal therefrom of an employer. Instead, the legislative solution was to impose withdrawal liability on an employer who withdraws. Through the enactment of MPPA, Congress amended ERISA to require an employer who withdraws from a multiemployer pension plan to continue to pay additional contributions to the plan to fund adequately certain unfunded pension benefits.
The obvious significance of the history of the MPPA to the instant case is that no comparable amendment act was ever adopted for welfare benefit plans. And the reason is equally obvious: The pertinent rules that apply to pension plans simply do not apply to welfare benefit plans. Given the substantial differences between pension plans and welfare benefit plans, the latter just do not experience the funding problems that are endemic to the former. For example, pension plans are subject to ERISA’s vesting *978 requirements and funding obligations, whereas welfare benefit plans are not.
IV
THE QUALIFYING EVENT
COBRA imposes on the sponsor of the plan that covered the individual when he experienced a qualifying event the duty of providing COBRA coverage. This statutory obligation arises at the moment the individual experiences a qualifying event that .triggers a loss of coverage under the plan, and ends only upon the occurrence of one of the terminating events specified in § 602(2) of ERISA. Nothing contained therein permits the sponsor of a multiemployer plan to terminate or transfer its COBRA obligation to a withdrawing employer simply because, at a time after the individual experiences a qualifying event, the employer withdraws from the plan and sponsors its own plan for its own employees. On the contrary, the obligation to provide COBRA coverage to the individual remains with the plan sponsor of the multiemployer plan, recap: The UFCW is a multiemployer plan, and the plain language of ERISA expressly designates the Board as the plan sponsor of the UFCW. The SCP Qualified Beneficiaries experienced their COBRA qualifying events prior to September 1, 1992, at a time when they were covered under the UFCW. Thus COBRA expressly imposes on the Board the duty to provide COBRA benefits to the SCP Qualified Beneficiaries until a terminating event occurs. The fact that AppleTree ceased making contributions to the UFCW on August 31, 1992, and thereafter sponsored a group health plan for its employees could not and does not relieve the Board of its obligations to provide COBRA benefits to the SCP Qualified Beneficiaries.
V
ERISA’s ‘WRITTEN INSTRUMENT” REQUIREMENT
Another aspect of ERISA that helps to frame the proper perspective within which to consider the narrow issue of this case is the statute’s “written instrument” requirement. It prohibits the Board from shifting its COBRA obligation to AppleTree absent the required documentation — documentation which here is non-existent. To appreciate fully the true significance of this requirement in the instant appeal, a more extensive explanation of the above alluded to purpose and structure of multiemployer plans should prove beneficial.
Multiemployer plans typically are established and maintained to provide employee benefits to workers in particular industries.[6] Multiemployer plans tend to be prevalent in those industries that have in common lower level workers who are employment-peripatetic by nature, such as the retail food, garment, trucking, mining, construction, and entertainment industries. Multiemployer plans are common in these and other similar industries, which are typified by many small companies that are “too small to justify an individual plan.”[7] Multiemployer plans comprise the pooled assets of numerous employers (each of which usually makes contributions pursuant to collective bargaining agreements) and the income generated by those assets.[8] Thus, multiemployer plans generally have participant populations that are larger than those of single-employer plans, and generally experience better risk-spreading opportunities. To the extent multiemployer plans are larger, they also enjoy economies of scale unavailable to all but the largest single-employer plans. As a result, multiem-ployer plans ■ often provide more favorable coverage to the participants and their benefi *979 ciaries than single employer plans are able to provide.
Of particular importance to the instant case is the widely recognized fact that mul-tiemployer plans are common in those industries in which, due to seasonal or irregular employment and high labor mobility, few workers would qualify for coverage under an individual employer’s plan if one were established.[9] For example, construction workers are frequently hired by a contractor for a single project that takes only a matter of weeks or months to complete.[10] Once the project is finished, those workers may be unemployed until another contractor needs their particular skills for a different project.[11] Thus, multiemployer plans, in contrast to single-employer plans, promote portability of benefits by workers who — generally not on their own volition — move from one employer to another.[12]
A worker is eligible to participate in a single-employer plan because of his employment relationship with one particular employer. In contrast, a worker is eligible to participate in a multiemployer plan because of his employment relationship with a particular industry and the several employers which participate in the plan. Consequently, multiemployer plans — unlike single-employer plans — are able to achieve portability of benefits through a plan structure that permits a worker who moves from one employer to another within the plan’s group of participating employers to enjoy continuous coverage under the plan.[13] The United States Department of Labor (“DOL”) also recognizes that multiemployer plans are primarily established and maintained for the purpose of permitting portability of benefits for the workers of a particular industry.[14]
Within that framework, the “written instrument” requirement is all the more meaningful. Section 402(a)(1) of ERISA expressly requires that “[ejvery benefit plan shall be established and maintained pursuant to a written instrument.”[15] The written instrument must “provide for one or more named fiduciaries who jointly or severally shall have the authority to control and manage the operation and administration of the plan.”[16] One purpose of ERISA’s “written instrument” requirement is to protect the interests of employees and their beneficiaries in employee benefit plans by giving them a clear understanding of their rights and obligations under the plan.[17] Recognizing that ERISA requires that employee benefit plans and any changes made to such plans be in writing, we have held that we lack the power to create a federal common law remedy in this area because ERISA specifically and clearly addresses the issue.[18] Thus, participants and beneficiaries of employee benefit plans must be able to rely on the plans’ written instruments for determination of benefits and determination of the party responsible for providing those benefits. Here, the UFCW designates the Board as that responsible party, *980 and does so expressly and in writing.[19]
Further, the UFCW expressly grants its participants and beneficiaries the' right to elect COBRA coverage under the UFCW when a qualifying event triggering loss of coverage thereunder is experienced.[20] There is nothing written in the UFCW, however, that permits the Board to terminate an individual’s COBRA coverage under the plan when and if that individual’s former employer withdraws from the plan and subsequently sponsors a group health plan for its own employees. Under the statute, the pertinent plan provisions, and the applicable legal authorities, it is the Board — not a formerly participating employer — which is obligated by law and under the terms of the UFCW to provide COBRA benefits to the SCP Qualified Beneficiaries. For us to hold otherwise would violate ERISA’s “written instrument” requirement and improperly deny the SCP Qualified Beneficiaries their right to uninterrupted COBRA coverage under the UFCW.
Additionally, for us to rule in this case in the manner urged by the Board could broadly but adversely affect the current structure and operation of multiemployer plans, including the rights and obligations of the participants and participating employers alike. As noted, over longer periods of time, workers in a given industry tend' to work for numerous employers within that industry. It was principally in recognition of this revolving door facet of such employment that employers and union representatives devised the multiemployer plan. Such a plan provides the means to ensure maintenance of a desired level of benefits for workers who toil in a particular industry and who change employers with some frequency. Through participation in a multiemployer plan, both the workers and.the employers understand that the plan will continue to provide health coverage to such workers even though they may work for two or more employers which participate in the plan at different times. Clearly, if we were now to permit plan sponsors to shift their COBRA obligations to employers such as AppleTree, plan sponsors of multiem-ployer plans would be able to deny participants their “portability of benefits” right without being required to amend the plan’s written instrument as required by ERISA.
In turn, the denial of the portability right could severely affect other benefit rights of the participants in multiemployer plans. For example, if AppleTree were required to provide the SCP. Qualified Beneficiaries with COBRA coverage under the new, single-employer AppleTree plan, the SCP Qualified Beneficiaries would become participants in the AppleTree plan and would be terminated as participants in the UFCW as of August 31,1992. This termination of coverage under the UFCW might well produce harsh consequences to the SCP Qualified Beneficiaries. First, to the extent that the level of coverage provided under the AppleTree plan were less favorable than the coverage provided under the UFCW, the SCP Qualified Beneficiaries would suffer a diminution in coverage (for, as noted earlier, multiemployer plans generally provide more favorable coverage than single-employer plans given economies of scale).
■ Second, such a termination of participation might adversely affect the level of the SCP Qualified Beneficiaries’ coverage under the UFCW when and if they were subsequently to become employed by other participating employers during their COBRA coverage period. For example, if an SCP Qualified Beneficiary were to be employed subsequently by a participating employer of the UFCW, that worker would again be required to meet the eligibility requirements of the UFCW prior to receiving the level of coverage to which he had been entitled immediately before his participation in the UFCW ended on August 31, 1992.[21] Also, to the extent that the “pre-existing condition” exclusion of certain ailments or diseases might apply to the SCP Qualified Beneficiary, he would now be denied coverage for such conditions, even though he would otherwise have continued to be entitled to coverage for them had his COBRA coverage not been terminated.[22]
Clearly, the public interest — and the intent of Congress — in encouraging the formation *981 of employee benefit plans could be adversely affected if we were to hold that AppleTree, rather than the Board, is obligated to provide COBRA benefits to the SCP Qualified Beneficiaries. And just as participants and beneficiaries must be able to rely on the plan’s written instrument, so too must employers be able to rely on the plan’s written instrument to determine their obligations. Employers are frequently discouraged from participating in or forming employee benefit plans if they perceive potential exposure to unlimited liability for participants’ benefits. This is another reason for which ERISA requires the instrument to define in writing the employers’ obligations under the plan.
Notably, neither the UFCW nor any other plan document either expressly or impliedly permits the Board to shift its COBRA obligations to AppleTree simply because the SCP Qualified Beneficiaries happened to have been employed by AppleTree when those beneficiaries experienced their COBRA qualifying event under the UFCW — and Ap-pleTree subsequently sponsored a group health plan for its own employees. That is not to say that the UFCW or the other plan documents could not have so provided. I simply note the fact that the UFCW does not in writing impose any liability on the withdrawing employer to subsidize the plan’s cost of providing COBRA benefits; but neither does it permit recovery by the withdrawing employer of any reserves attributable to the contributions such employer may have made to the UFCW. Again, I do not mean to suggest that the plan documents could not so provide; I simply observe that no such writing exists in connection with the UFCW. The admittedly belabored point I make is that in the absence of contrary written provisions ERISA does not allow the Board to evade its COBRA obligation simply because the financial soundness of the UFCW may be adversely affected if the Board is required to provide COBRA coverage to the SCP Qualified Beneficiaries.
VI
AD HOMINEM
In closing, I am constrained to comment on another aspect of the position urged by the Board in this case. Given the strong motivation of the entities and organizations that bargain so vigorously with the employers for the adoption of multiemployer plans — a central feature of which is the designation of the Board rather than the employer as the plan sponsor — I find illogical, if not disingenuous, the strident urgings of the Board to this court that we mystically pass the mantle of plan sponsor from the Board to the employer, thereby imposing liability on AppleTree for the costs of providing COBRA benefits to the SCP Qualified Beneficiaries. The constant emphasis of such bargaining is, as noted above, the ability to ensure to the workers the portability of their plan benefits and the avoidance of breaks in coverage and such attendant evils as requalification, delay periods for eligibility, and exposure to denial of coverage of “new” pre-existing conditions that were not pre-existing — and thus were not excluded from coverage — for purposes of former participation in the same plan. It ill behooves those whose minions benefit so greatly from the Board’s position as plan sponsor to gainsay such sponsorship for the expediency of shifting COBRA costs to the departing or withdrawing employer.
VÍI
CONCLUSION
. To repeat, I wholeheartedly concur in Judge Smith’s opinion that, based on the plain language of ERISA and UFCW’s written instruments, the Board is the plan sponsor and thus is obligated to provide COBRA coverage to SCP Qualified Beneficiaries under the UFCW until a statutory event should occur to trigger termination of such coverage. The fact that AppleTree withdrew from the UFCW and thereafter sponsored a single-employer group health plan for its employees after the SCP Qualified Beneficiaries became entitled to receive COBRA coverage under the UFCW is clearly not an event that terminates the Board’s obligations to provide COBRA coverage to the SCP Qualified Beneficiaries. I find that the broad perspective in which this decision can and should be viewed *982 provides additional undergirding for the majority opinion, consistent with the policies, reasons and rationale of ERISA and COBRA and the raison d’etre of multiemployer plans.

. 29 U.S.C. § 1162(1).

. Id. (emphasis added).

. See Langbein & Wolk, Pension and Employee Benefits Law, 48-52; 359-2d, BNA Tax Management, "Multiemployer Plans — Special Rules," A-1.

. Langbein & Wolk, Pension and Employee Benefits Law at 49.

.See Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985); Schneider Moving & Storage Co. v, Robbins, 466 U.S. 364, 104 S.Ct. 1844, 80 L.Ed.2d 366 (1984); Central States, Southeast and Southwest Areas Pension Fund v. Gerber Truck, 870 F.2d 1148, 1154 (7th Cir.1989) (en banc).

. Langbein & Wolk, Pension Employee Benefit Law at 49.

. Id.

. Id.

. Id. at 52.

. Id.

. See 29 C.F.R. § 2510.3-37(c). The DOL requires a substantial business purpose before a multiemployer plan may be established. Such business purpose includes the interest of a labor organization in securing employee benefit plans for its members. The DOL examines four factors to determine the existence of a substantial business purpose, any one of which may be sufficient: (1) maintenance of a plan by a substantial number of unaffiliated contributing employers covering a substantial portion of a trade, craft or industry in terms of employees or locality; (2) closeness of relationship of benefits to years of service within the trade, craft or industry rather than with a given employer; (3) extent of collective bargaining in matters other than employee benefit plans between the employer organization and the employers maintaining the plan; and (4) the extent to which the administrative burden and expense of providing benefits through single-employer plans would be greater than through multiemployer plans.

. 29 U.S.C. § 1102(a)(1).

. Id.

. Cefalu v. B.F. Goodrich Co., 871 F.2d 1290, 1296 (5th Cir.1989).

. Id. at 1297.

. See §§ 1.33 and 4.5 of the UFCW; §§ 1.8, 7.1, 7.2, 7.3, 8.1 and 9.2 of UFCW’s Trust Agreement.

. See § 2.8 of the UFCW.

. See §§ 2.3 and 2.5 of the UFCW.

. See § 4.4 of the UFCW.