NEW YORK STATE TEAMSTERS CON-
FERENCE PENSION AND RETIRE-
MENT FUND, Plaintiff–Appellee–
Cross–Appellant,

v.

BOENING BROTHERS, INC., and
Charles Snyder Beverages, Inc., Defen-
dants–Appellants–Cross–Appellees.

Nos. 1224, 1664,
Dockets 95–7782, 95–7834.

United States Court of Appeals,
Second Circuit.

Argued April 26, 1996.

Decided Aug. 15, 1996.

Eugene T. D'ablemont, New York City
(Kelly, Drye & Warren, New York City, of
counsel), for Defendants–Appellants–Cross–
Appellees.

Vincent M. DeBella, Utica, New York (Pa-
ravati, Karl, Green & DeBella, Utica, New
York, of counsel), for Plaintiff–Appellee–
Cross–Appellant.

Before: VAN GRAAFEILAND and MAHONEY, Circuit Judges, and CARTER, District Judge.*

MAHONEY, Circuit Judge.

Defendants-appellants-cross-appellees Boening Brothers, Inc. ("Boening") and Charles Snyder Beverages, Inc. ("Snyder") appeal from a judgment entered July 10, 1995 in the United States District Court for the Northern District of New York, Frederick J. Scullin, Jr., *Judge*, that granted summary judgment and an injunction in favor of plaintiff-appellee-cross-appellant the New York State Teamsters Conference Pension and Retirement Fund (the "Fund") in this action brought pursuant to the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and the Labor Management Relations Act, 1947, as amended, 29 U.S.C. § 141 *et seq.* The Fund successfully contended below that Boening and Snyder, who each had a collective bargaining agreement ("CBA") in effect with Local 812 ("Local 812") of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Teamsters"),[1] had illegally refused to submit to an audit of payroll records for all of their employees, including employees who were not covered by the CBAs. *See New York State Teamsters Conference Pension & Retirement Fund v. Boening Bros., Inc.*, 891 F.Supp. 81, 85–87 (N.D.N.Y.1995). The Fund was granted permanent injunctive relief requiring Boening and Snyder to submit to audits of the payroll records of all their employees, but was denied attorney fees and costs pursuant to 29 U.S.C. § 1132(g), *see* 891 F.Supp. at 88, and cross-appeals from that denial.

We affirm the judgment of the district court.

## Background

The Fund is a "multiemployer plan" within the meaning of 29 U.S.C. § 1002(37)(A), and was established to provide pension and retirement benefits for union members who work for employers that contribute to the Fund pursuant to CBAs with specified local unions of the Teamsters. Boening and Snyder are employers who make contributions to the Fund pursuant to their CBAs with Local 812.[2]

Boening is a family-owned beer distributor that employs approximately thirty drivers and warehousemen who are represented by Local 812. These employees have been covered by successive three-year CBAs between Boening and Local 812 (or its predecessor, *see supra* note 1) since at least 1973. Under these CBAs, Boening agreed to contribute monthly payments to the Fund for the pension benefits of its "regular" employees—*i.e.*, employees who work a certain number of days per year as defined in the applicable CBA. Other than requiring these contributions, the CBAs do not impose any obligation upon Boening with respect to the Agreement and Declaration of Trust (the "Trust Agreement") that established and governs the Fund.

The Fund is the successor to the Brewery Workers Pension Fund (the "Brewery Fund"), to which Boening had contributed before the Fund absorbed the Brewery Fund pursuant to an Agreement and Plan of Integration (the "Merger Agreement") in 1973. *See Boening Bros., Inc.*, 891 F.Supp. at 83. The Merger Agreement states that "each Employer under the Brewery Trust shall be considered to be an Employer within the meaning of that term under the [Trust Agreement]." It further provides that:

All contributions by employers ... shall be [made] in accordance with the terms and at the rates set forth in the appropriate [CBAs] and such contributions and re-

---

* The Honorable Robert L. Carter of the United States District Court for the Southern District of New York, sitting by designation.

1. Local 812 succeeded Brewery Delivery Employees Local Union No. 46 ("Local 46") as the union party to these CBAs some time after June 1988.

2. Although the Fund sued each defendant separately, the district court consolidated the actions. *See Boening Bros., Inc.*, 891 F.Supp. at 83 n. 1. The factual presentation on appeal, however, relates almost exclusively to Boening.

ports shall be made in accordance with any rules established by the Trustees of the [Fund]. The Brewery employers shall execute agreements known as Stipulations, a copy of which is attached hereto and made a part hereof, as is required of all other employers contributing to the [Fund].

Boening was not a party to the Merger Agreement.

The Trust Agreement, to which Boening also is not a party, does not define the term "employer", but states that the term "Contributing Employer" is used in the Trust Agreement to refer to those employers who have entered into CBAs with specified Teamsters locals and periodically pay a sum of money "more nearly described in such [CBAs]" to the Fund. The Trust Agreement does not specify any further obligations of Contributing Employers, and makes no reference to the "Stipulations" described in the Merger Agreement. However, the Trust Agreement does invest the trustees of the Plaintiff Fund with the following authority:

1. ... The Trustees shall have the authority to manage and control the administration and operation of the Fund and Plan.

2. The Trustees ... shall have the power to demand, collect, receive and hold Employer contributions and take such steps, including the institution and prosecution of or ... the intervention in any proceeding at law, in equity or in bankruptcy, or in an assignment for the benefit of creditors, as may be necessary or desirable to effectuate the collection of such Employer [c]ontributions.

. . . .

11. ... (i) The Board of Trustees shall have the power to make rules and regulations not inconsistent with the terms [of the Trust Agreement] to carry out the provisions [of the Trust Agreement].

In 1974, the Fund initiated litigation in various judicial fora to invalidate the Merger Agreement on the basis of fraud and misrepresentation. Boening and other employers were subsequently joined as third-party defendants. During the course of that litigation, the Fund refused to accept the contributions of Boening and certain other brewery employers (collectively the "Brewery Employers") to the Fund because the Brewery Employers would not enter into a "Stipulation," or participation agreement ("Participation Agreement"), as required by the Merger Agreement. (The Fund interpreted the standard Participation Agreement to require pension contributions on behalf of all of a contributing employer's employees, including its seasonal and casual employees, as well as its "regular" employees.). Local 46, the predecessor of Local 812, *see supra* note 1, then sought to enjoin the Fund from declining to accept contributions from the Brewery Employers. The district court issued a preliminary injunction restraining the Fund from refusing to accept contributions from the Brewery Employers *pendente lite.*

However, the propriety of the Fund's refusal to accept contributions from the Brewery Employers was never determined on the merits. Instead, the parties entered into an agreement dated August 30, 1990 (the "Settlement Agreement") that settled the litigation. The Settlement Agreement reserved, *inter alia,* "any right" that the Fund had to require that the Brewery Employers enter into Participation Agreements or submit to audits, and "any right" that the Brewery Employers had to refuse to enter into Participation Agreements or submit to audits. The Settlement Agreement further provided that the Fund recognized the validity of the Merger Agreement.

By letter dated January 3, 1991, the Fund informed Boening that it intended to audit Boening's monthly employer reports, payroll records for "both bargaining unit and non-bargaining unit employees," New York quarterly tax reports, CBAs, worker compensation logs and reports (including yearly O.S.H.A. logs summarizing illness and/or injuries and other specified forms), and company disability reports for the period November 1977 through December 1990. Boening responded by letter dated January 15, 1991, asserting that the Fund was not legally entitled to conduct the requested audit.

The Fund commenced this litigation on March 22, 1991. By letter dated April 10, 1991, Boening offered (without prejudice to

its position that the Fund was not entitled to conduct any audit of Boening) to submit to an audit of its payroll records for all "regular" employees covered by its current CBA with Local 812 for the period covered by that CBA. The Fund refused this offer.

On June 26, 1992, the Fund moved for summary judgment, seeking that Boening be ordered to submit to the requested audit and to reimburse the Fund's attorney fees and costs pursuant to 29 U.S.C. § 1132(g). After consolidating the Fund's actions against Boening and Synder, *see supra* note 2, the district court granted summary judgment to the Fund, ruling that "by making contributions to the [Fund] in accord with [the applicable] CBAs, [Boening and Snyder] are bound by the [Fund's] governing documents as a matter of law, and are thus subject to the requested audit." *Boening Bros.*, 891 F.Supp. at 86–87. The court determined that Boening and Snyder would be required to submit the payroll records of all their employees, and not just their "regular" employees, for audit, *id.* at 87, but added that "the audit should not be wholly unbridled," *id.* Noting that the parties had not "specifically addressed" the scope of the audit, *id.* at 88, the court stated that it would "allow [Boening and Synder] to bring, if necessary and proper, motions for a protective order to deal with issues of privacy and confidentiality," *id.* Finally, the court declined to award the Fund attorney fees and costs pursuant to section 1132(g), noting that "there is no evidence that [Boening and Snyder] refused the audit in bad faith," 891 F.Supp. at 88, and that "[t]he law in this area was unsettled," *id.*

This appeal and cross-appeal followed.

## Discussion

We address first the appeal of Boening and Snyder from the district court's direction that they submit to the audit demanded by the Fund, and thereafter the Fund's cross-appeal from the denial of attorney fees and costs under section 1132(g).

### A. *The Appeal of Boening and Snyder.*

■ Boening contends that it need not submit to the disputed audit because it never signed, or in any way consented to be bound by, the Trust Agreement. Boening correctly claims that it was not a party to the Trust Agreement, the Merger Agreement, or a Participation Agreement, and that its CBA with Local 812 did not incorporate any provision of these agreements or require Boening's compliance with them. Further, as previously noted, the Settlement Agreement that Boening did sign was carefully neutral on the audit issue.[3] Clearly, then, Boening has not entered into any explicit contractual undertaking to submit to an audit by the Fund. We nonetheless conclude that such an audit may be conducted by the trustees of the Fund pursuant to their fiduciary duties under the Trust Agreement and the common law of trusts as incorporated in ERISA.

We begin with the Supreme Court's decision in *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.*, 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985). Although not directly apposite here, *Central States* guides our analysis because it confronted a similar issue. *See Plumbers Local No. 150 Pension Fund v. Vertex Constr. Co.*, 932 F.2d 1443, 1450 (11th Cir.1991) ("Although the trust agreement in *Central [States]* was incorporated in the [CBA], the language used by the Court in that case is nevertheless instructive.").

*Central States* addressed the question "whether an employer who participates in [an ERISA] multiemployer benefit plan . . . must allow the plan to conduct an audit involving the records of employees who the employer denies are participants in the plan." 472 U.S. at 561, 105 S.Ct. at 2835–36. The employer contesting the audit in *Central States* had explicitly agreed in the pertinent CBA to

---

**3.** As we have already observed, *see supra* note 2, the factual presentation on this appeal relates almost exclusively to Boening. In the absence of any advice by the parties to the contrary, we assume that Snyder is situated similarly to Boening in that (1) the applicable CBA imposes upon Snyder only a duty to contribute to the Fund, (2)

Snyder is not a party to the Trust Agreement, the Merger Agreement, or a Participation Agreement, and (3) although Snyder, like Boening, executed the Settlement Agreement, its participation in that agreement does not affect the issues presented on this appeal.

be bound by the terms of the trust agreements governing the plan. *Id.* at 562, 105 S.Ct. at 2836. The employer had also entered into a "participation agreement" in which it assented to all actions taken by the plan trustees within the scope of their authority in administering the plan. *Id.* at 568 n. 8, 105 S.Ct. at 2839 n. 8. The Court concluded that the authority to audit under the terms of the trust agreements by which the employer had agreed to be bound was "clear". *Id.* at 568, 105 S.Ct. at 2839.

After ruling that a contractual basis existed for the disputed audit, *Central States* discussed whether such a contractual interpretation "would be unreasonable in light of the policies and protections embodied in ERISA," as it deemed the Sixth Circuit Court of Appeals to have ruled. *Id.* The Court concluded that the audit requirement was not only "entirely reasonable in light of ERISA's policies," *id.* at 569, 105 S.Ct. at 2839, but also "highly relevant to legitimate trustee concerns" in view of "the duties of plan trustees under ERISA" and of "the common law of trusts upon which ERISA's [trustee] duties are based," *id.* The Court noted the common law duties of a trustee to preserve and maintain trust assets, to determine both the property that forms the *res* of the trust and the identity of its beneficiaries, and to notify trust beneficiaries concerning distributions to·them. *Id.* at 572, 105 S.Ct. at 2841. The Court then stated:

> The provisions of ERISA make clear that a benefit plan trustee is similarly subject to these [common law] responsibilities, not only as a result of the general fiduciary standards of loyalty and care, ... but also as a result of more specific trustee duties itemized in [ERISA, including informing beneficiaries of their rights under ERISA plans and precluding extensions of credit to participating employers by ensuring prompt collection of employer contributions].
>
> Moreover, that these trustee duties support the auditing authority claimed in this case is strongly suggested by the other provisions of ERISA as well as by the positions of the administrative agencies charged with the administration of the Act.

For example, § 209 of the Act supplements the benefit plans' duties to furnish reports to plan participants by requiring employers to maintain records on employees and to furnish to benefit plans the information needed for the plans' fulfillment of their reporting duties. 29 U.S.C. § 1059....

> In light of the general policies behind ERISA as well as the particular provisions of the statute, we can only conclude that there is no conflict between ERISA and those concerns offered by Central States to justify its audit program. Both the concern for fully informing participants of their rights and status under a plan and the concern for assuring the financial integrity of the plans by determining the class of potential benefit claimants and holding employers to the full and prompt fulfillment of their contribution obligations are proper and weighty within the framework of ERISA.

472 U.S. at 572–74, 105 S.Ct. at 2841–42.

Justice Stevens, writing for Chief Justice Burger and then-Justice Rehnquist, concurred in part and dissented in part. He agreed with the majority opinion insofar as it held that "[i]f an employer who participates in a multiemployer benefit plan enters into an agreement that authorizes the trustees of the plan to conduct an audit of the employer's personnel records, such an agreement is not prohibited by ERISA itself." *Id.* at 582, 105 S.Ct. at 2846 (Stevens, J., concurring in part and dissenting in part). He added, however, that "the right to conduct an audit of the kind involved in this case must be granted by contract; it is not conferred by ERISA itself." *Id.* at 583, 105 S.Ct. at 2846–47. He concluded that the pertinent agreements required submission only to an audit of employees covered under the applicable CBA. *Id.* at 583, 105 S.Ct. at 2846–47.

■ *Central States* interpreted ERISA to "invoke[ ] the common law of trusts to define the general scope of [trustees'] authority and responsibility." *Id.* at 570 & n. 10, 105 S.Ct. at 2840 & n. 10; *see also Varity Corp. v. Howe*, —— U.S. ——, ——, 116 S.Ct. 1065, 1070, 134 L.Ed.2d 130 (1996) ("[F]iduciary duties [under ERISA] draw much of their content from the common law of trusts, the

law that governed most benefit plans before ERISA's enactment."). "We are, of course, bound by any constructions put upon a statute by the Supreme Court...." *United States v. Herrera,* 584 F.2d 1137, 1145 (2d Cir.1978); *see also United States v. County of Humboldt,* 615 F.2d 1260, 1262 (9th Cir. 1980) ("[W]e are bound by the Supreme Court's determinations of legislative history and purpose.") (internal quotation omitted).

Under the common law of trusts, "[t]he nature and extent of the duties and powers of the trustee are [generally] determined ... by the terms of the trust." *Restatement (Second) of Trusts* § 164 (1959) ("*Restatement*"). When those terms are silent, trustees are bound by duties that "may arise from the nature of the relationship." *Id.* § 164 cmt. h. Further, trustees are obliged to administer the trust, *id.* § 169, to keep and render accounts, *id.* § 172, to take and keep control of the trust property, *id.* § 175, and to enforce claims, *id.* § 177. "[T]he trustee can properly exercise such powers and only such powers as (a) are conferred upon him in specific words by the terms of the trust, or (b) are necessary or appropriate to carry out the purposes of the trust and are not forbidden by the terms of the trust." *Id.* § 186.

We believe that an audit of Boening's employment records by the Fund falls well within the scope of a trustee's common law fiduciary duties and powers. As previously described, the Trust Agreement vests the trustees of the Fund with authority "to demand, collect, receive and hold Employer contributions and take such steps ... as may be necessary or desirable to effectuate the collection of such Employer Contributions." Accordingly, "[i]f the settlor or a third person has covenanted to transfer property to the trust, it is the duty of the trustee to take reasonable steps to enforce such covenant." *Restatement* § 177 cmt. a. Boening promised to contribute to the Fund for its regular employees, and an audit certainly constitutes a reasonable method by which the Fund may "effectuate the collection of such Employer Contributions." It is also an effective means for the Fund to administer the fund, *id.* § 169, keep appropriate accounts, *id.* § 172, take and keep control of the trust property,

*id.* § 175, and enforce claims, *id.* § 177. Indeed, we have recently stated that "[f]und trustees have a fundamental duty to locate and take control of fund property—a duty for which the right to audit is crucial." *Jaspan v. Glover Bottled Gas Corp.,* 80 F.3d 38, 41 (2d Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 77, —— L.Ed.2d —— (1996).

Further, the Trust Agreement states that it was created "for the purpose of providing pensions or retirement benefits to the employees covered therefor under [CBAs] or supplements thereto, between the [Teamsters] Union and contributing Employers." Boening is a contributing employer, and entrusts these funds to the management of the Fund trustees. Thus, Boening provides for its regular employees' pension and retirement benefits unburdened by the administrative concerns normally attendant to the management of such plan benefits. Accordingly, since this trust is intended "to commit the care and management of the trust property to the trustee, the powers of the trustee are much more extensive" than those of a trustee who merely holds title to property, *Restatement* § 186 cmt. d, and may encompass the authority to audit a contributing employer's pertinent records.

We recognize that the employer in *Central States,* unlike Boening, had contractually committed to submit to an audit, and that the Court's opinion included the caveat that it had "no occasion to determine whether ERISA would independently confer on the trustees a right to perform the sort of audit demanded in this case *in the face of trust documents that explicitly limit the audit powers of trustees.*" 472 U.S. at 581, 105 S.Ct. at 2845–46 (emphasis added). We are also not confronted in this case, however, with "trust documents that explicitly limit the audit powers of trustees." *Id.* The Trust Agreement does not limit or preclude an audit of Boening's employment records. If that were the case, the Fund would presumably be bound by its common law and ERISA fiduciary duties to abide "by the terms of the trust." *Restatement* § 164(a). However, since the Trust Agreement makes no specific reference to audits, we believe

that *Central States'* discussion of an ERISA trustee's duties suggests that an employer audit may be conducted by ERISA trustees so long as that audit is "necessary or appropriate to carry out the purposes of the trust and [is] not forbidden by the terms of the trust." *Restatement* § 186(b).

Two circuits agree with this conclusion. In *Vertex,* the Eleventh Circuit answered in the affirmative the question "[w]hether an employer who, pursuant to a [CBA] makes contributions to an employee benefit trust fund governed by ERISA, is bound by the trust agreement for that fund, despite the fact that the trust agreement is not incorporated in the [CBA]." 932 F.2d at 1450. Noting that *Central States* was distinguishable because in *Vertex* the trust agreement was not incorporated in the CBA, *id.,* the Eleventh Circuit nonetheless "conclude[d] that the nature of the relationship between the employer, the union, and the trust dictate[d] that the trustees m[ight] [audit the employer in accordance with the provision of the trust agreement]," *id.* The court added that it "fail[ed] to see how [the employer could] avail itself of the benefits of the [employee benefit funds] without also being subject to the rules that govern them." *Id.* at 1451 (citing *Santa Monica Culinary Welfare Fund v. Miramar Hotel Corp.,* 920 F.2d 1491, 1494 (9th Cir.1990), *cert. denied,* 501 U.S. 1232, 111 S.Ct. 2855, 115 L.Ed.2d 1023 (1991)). Accordingly, because the relevant trust agreement explicitly empowered the fund trustees to audit contributing employers, *see id.* at 1450, the employer was required to submit to the disputed audit.

Similarly, in *Miramar,* the trust agreement explicitly authorized the fund trustees to audit the records of contributing employers, and the CBA required the employer only to make contributions to the trust fund and did not incorporate the trust agreement. *See* 920 F.2d at 1492. The Ninth Circuit ruled that: "It is clear that by making contributions to the [trust fund], Miramar intended its employees to receive benefits from the [f]und. Once Miramar intended its employees to be covered by the [f]und, the [t]rust [a]greement governing the [f]und requires Miramar to be bound to its terms." 920 F.2d at 1494.

While both *Vertex* and *Miramar* interpreted trust agreements that expressly authorized some type of employer audit, we have already concluded that such authority is easily implied from the Trust Agreement, interpreted in light of the common law of a trustee's fiduciary duties and powers. Further, both courts rested their decisions on a broader basis, namely, "the nature of the relationship between the employer, the union, and the trust." *Vertex,* 932 F.2d at 1450; *see also Miramar,* 920 F.2d at 1494. We recognized this broader basis for decision in *Jaspan,* interpreting *Vertex* and *Miramar* to "h[o]ld that an employer, which was bound by its [CBA] to contribute to a benefit fund but had not signed or agreed to be bound by the trust documents, was nonetheless responsible for an obligation imposed on contributing employers by the trust agreement [to submit to an audit]." 80 F.3d at 41.

In *Jaspan,* however, we declined to apply the "broad language" of *Vertex* and *Miramar* to bind a nonsignatory employer to a liquidated damages provision in a trust agreement. *Id.* We concluded that while authority to audit was "crucial" to the trustees' "fundamental duty to locate and take control of fund property," *id.,* a damages provision that imposed contractual liability upon a party that was not contractually bound to the trust agreement was "a provision of far less importance to the fund trustees' performance of their [fiduciary] duties," *id.* This reasoning supports our conclusion that an audit of employer records "may be necessary or desirable to effectuate the collection of ... Employer Contributions" within the meaning of the Trust Agreement, and therefore constitutes a legitimate exercise of the trustees' fiduciary duties.

Nonetheless, we emphasize that any audit conducted pursuant to the Fund's fiduciary duties is necessarily circumscribed by the Fund's coordinate obligation not to abuse this authority. "Where discretion is conferred upon [a] trustee with respect to the exercise of a power, its exercise is not subject to control by the court, except to prevent

an abuse by the trustee of his discretion." *Restatement* § 187.

In this regard, *Central States* opined that:

In light of ERISA's standards, Central Transport correctly argues that the audit request would be illegitimate under the standard of loyalty if it were actually an effort by plan trustees to expand plan coverage beyond the class defined in the plans' terms or to acquire information about the employers to advance union goals. It similarly argues that the audit would be imprudent if it were clearly wasteful of plan assets or unrelated to legitimate plan concerns.

472 U.S. at 571 n. 12, 105 S.Ct. at 2840–41 n. 12; *see also id.* at 583, 105 S.Ct. at 2846–47 (Stevens, J., concurring in part and dissenting in part) (The trustees " 'are limited in their discretion by ... the common law concept that a trustee may only act within the scope of his or her authority.' ") (quoting *Central States, Southeast & Southwest Areas Pension Fund v. Central Transport, Inc.,* 698 F.2d 802, 810 (6th Cir.1983), *rev'd,* 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) (alteration in original)); *Building Trades Employers Ass'n v. New York State Teamsters Conference Pension & Retirement Fund,* 761 F.2d 115, 117 (2d Cir.1985) (per curiam) ("[S]o long as the trustees act solely in the proper interests of the Fund and its participant-employees and do not abuse their powers by arbitrarily intermeddling in the private management and labor negotiations of the sponsoring employers, courts should refrain from faulting their actions.").

In this case, Boening and Snyder argue that the Fund's requested audit constitutes an improperly motivated effort to expand the plan coverage beyond the terms of their CBAs to include both their "regular" and "casual" employees. We confess some bewilderment as to why the Fund considers the broad range of documents that it seeks to audit for the extended period from November 1977 to the present essential to confirming that Boening made appropriate contributions to the plan for its thirty or so bargaining unit employees. Further, the historical effort of the Fund to require Boening, Snyder, and the other Brewery

Employers to enter into Participation Agreements that would mandate contributions to the Fund for all their employees arouses concern that the requested audit may mask an ulterior purpose.

The issue of the scope of the audit is not before this Court, however, and has not yet been addressed by the district court. *See Boening Bros.,* 891 F.Supp. at 87–88. The district court noted that it would "allow the defendants to bring, if necessary and proper, motions for a protective order to deal with issues of privacy and confidentiality." *Id.* at 88 (citing *DeMarco v. C & L Masonry, Inc.,* 891 F.2d 1236, 1240 (6th Cir.1989)). In addition, it may be appropriate for Boening and/or Snyder to seek protection from an audit that is unduly broad or intrusive in its scope, or threatens to impose unfair and disproportionate expense. *See Central States,* 472 U.S. at 571 n. 12, 105 S.Ct. at 2840–41 n. 12; *DeMarco,* 891 F.2d at 1240 ("If a showing of prospective harm to the Employers were made, the district court could enter [an appropriate] protective order...."); *Building Trades Employers Ass'n,* 761 F.2d at 117; *cf. Vertex,* 932 F.2d at 1452 (noting that district court had appointed a special master to supervise audit of employer).

In any event, we conclude only that the Fund is authorized, in implementation of its fiduciary duties, to conduct an audit that is no broader in scope than necessary to achieve its objective and no more extensive than the scope of the trustees' authority. To this end, the production of payroll records for all employees, including those employees not covered by the CBA, may legitimately be required to ensure that an employer's determination of employees' covered or noncovered status is correct. *See Central States,* 472 U.S. at 566–68, 105 S.Ct. at 2838–39.

**B.** *The Fund's Cross–Appeal.*

■ The Fund appeals from the district court's refusal to award attorney fees and costs pursuant to 29 U.S.C. § 1132(g). Section 1132(g) provides in pertinent part:

(1) In any action under this subchapter (other than an action described in paragraph (2)) by a participant, beneficiary, or

fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party.

(2) In any action under this subchapter by a fiduciary for or on behalf of a plan to enforce section 1145 of this title in which a judgment in favor of the plan is awarded, the court shall award the plan—

(A) the unpaid contributions,

(B) interest on the unpaid contributions,

(C) an amount equal to the greater of—

(i) interest on the unpaid contributions, or

(ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the amount determined by the court under subparagraph (A),

(D) reasonable attorney's fees and costs of the action, to be paid by the defendant, and

(E) such other legal or equitable relief as the court deems appropriate.

As is apparent from the statutory text, an award of attorney fees and costs is discretionary under subsection (1), and mandatory under subsection (2), of section 1132(g). The Fund contends that this is a section 1132(g)(2) action to enforce section 1145, which provides:

Every employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

In our view, this is not an action "to enforce section 1145 ... in which a judgment in favor of the plan [has been] awarded" within the meaning of section 1132(g)(2). Such a judgment would normally include "unpaid contributions," § 1132(g)(2)(A), and there has been no determination that either Boening or Snyder owe "unpaid contributions" to the Fund. *See Iron Workers Dist. Council Welfare & Pension Funds v. Hudson Steel Fabricators & Erectors, Inc.*, 68 F.3d 1502, 1507

(2d Cir.1995) ("[A section 1132(g)(2) ] action must be one to enforce the obligation to pay contributions under § 1145, and therefore no such suit can be commenced in the absence of unpaid contributions.... "). In both *Vertex*, 932 F.2d at 1452–53, and *Miramar*, 920 F.2d at 1495–96, the trust fund's application for attorney fees and costs was deemed to be governed by subsection (1), rather than (2), of section 1132(g), and the applications were denied even though the plaintiff trust fund prevailed in both cases on the merits. The only circuit court case cited to us by the Fund on this issue is *Carpenters Amended & Restated Health Benefit Fund v. John W. Ryan Construction Co.*, 767 F.2d 1170 (5th Cir.1985). That case addressed the wholly inapposite issue "whether an employer, sued by employee benefit plans for delinquent contributions, may avoid liability for statutory interest and attorney's fees by paying the delinquent contributions after suit is brought but before judgment." *Id.* at 1171.

■ Thus, the district court correctly focused upon whether attorney fees and costs were appropriate under section 1132(g)(1), which provides that "the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." We conclude that the district court did not abuse its discretion in declining to award fees and costs in this case. *See Mendez v. Teachers Ins. & Annuity Ass'n & College Retirement Equities Fund*, 982 F.2d 783, 788–89 (2d Cir.1992) (applying abuse of discretion standard to district court's decision to award attorney fees pursuant to section 1132(g)(1)); *Vertex*, 932 F.2d at 1453 (denying attorney fees and costs for reasons similar to those articulated by district court in this case); *Miramar*, 920 F.2d at 1496 (same).

## Conclusion

The judgment of the district court is affirmed.