Lucy MARTINEZ, et al., Individually, and on behalf of themselves and all others similarly situated, Plaintiffs,

v.

DISTRICT 1199J NATIONAL UNION OF HOSPITAL AND HEALTH CARE EMPLOYEES, AFSCME, AFL–CIO; District 1199J New Jersey Benefit Fund; District 1199J New Jersey Pension Fund for Hospital and Health Care; Preferred Choice Management Systems, Inc., d/b/a Magnacare; Santo M. Sacco; Brendan Farrelly; Steven Schilsky; Victor Garcia; Joseph Franklin; Myrtle Hartsfield; Carolyn Keys; John Doe Defendants 1 Through 20, The Trustees of the District 1199J New Jersey Pension Fund for Hospital and Health Care Employees; John Dandridge, et al., Defendants.

No. 97 CV 3381(WJM).

United States District Court, D. New Jersey.

Sept. 9, 2003.

---

proper notice of the termination of benefits to the Plaintiffs, and thus did not breach its fiduciary duties; (2) that the Fund did not violate COBRA; (3) that the Plaintiffs are not entitled to "direct payment coverage" or "unemployment continuation coverage" and (4) that the Union did not breach its duty of fair representation.

Reginald H. Rutishauser, Esq., Kantrowitz, Goldhamer, & Graifman, Montvale, NJ, for Plaintiffs.

Nancy Oxfeld, Esq., Oxfeld Cohen, P.C., Newark, NJ, for Defendants District 1199J, District 1199J Welfare Fund and Trustees, and District 1199J Pension Fund and Trustees.

## MEMORANDUM OPINION

MARTINI, District Judge.

Presently before this Court are cross motions for summary judgment filed by the certified class action Plaintiffs, Defendants District 1199J National Union of Hospital and Health Care Employees, AFSCME, AFL–CIO (hereafter "Union Defendant"), and District 1199J New Jersey Benefit Fund and Trustees (hereafter "Benefit Fund Defendant"). Plaintiffs cross move for partial summary judgment on liability on the following grounds: (1) that the Defendant Fund breached its fiduciary duties to the Plaintiffs by failing to notify Plaintiffs of the employer's delinquent contributions; (2) that the Defendant Fund improperly denied Plaintiffs access to COBRA coverage, "direct payment coverage," and "unemployment continuation coverage"; and (3) that the Defendant Union breached its duty to provide fair representation to the Plaintiffs. Defendants argue that (1) the Benefit Fund gave

## BACKGROUND

At all times relevant to this action, Plaintiffs were employees of United Hospital and members of the Defendant Union. Pursuant to a collective bargaining agreement, United Hospital was required to make monthly contributions to the Defendant Benefit Fund, which is a Taft–Hartley, multi-employer fund with approximately 35 participating employers in New Jersey. The Fund is administered by a Board of Trustees whose members are chosen by the Union and the contributing employers. At the time of the events that gave rise to the present lawsuit, Joseph Carpenter was the Director of the New Jersey 1199J Pension Fund and 1199J Benefit Fund.

According to the collective bargaining agreement, United Hospital was required to make monthly payments to the Benefit Fund. The amount owed to the Fund each month was based on the previous month's payroll, and was due no later than thirty days following the payroll month on which the contribution was based. "By way of example, a January contribution shall be based on the payroll for the month of December and shall be made no later than the thirtieth (30th) day of January." Plaintiffs' Exhibit 1, at p. 43. United failed to make its payment to the Benefit Fund in December of 1996, and all payments thereafter. *See* Plaintiffs' Stmt. of Facts, at ¶ 35; Defendants' Response, at ¶ 35.

At some time in January, 1997, the Benefit Fund scheduled an arbitration, and on January 31, 1997, it received an award of $263,213.97 for United's delinquent December contribution.[1] *See* Plaintiffs' Exhibit 21. By a letter dated February 4, 1997, and signed by Joseph Carpenter, Union members were informed that United Hospital was over sixty days in arrears in its payments to the Fund, and, consequently, member medical benefits were suspended effective December 1, 1996. *See* Plaintiffs' Exhibit 8. Joseph Carpenter explained that the Fund followed a verbal delinquency policy that allows the retroactive termination of benefits if an employer becomes sixty days behind in its payments to the Fund. *See* Deposition of Joseph Carpenter ("Carpenter Dep."), Plaintiffs' Exhibit 11, at p. 82. United Hospital filed for bankruptcy on February 19, 1997.

### STANDARD OF REVIEW

Summary judgment may be granted only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, a Court must construe the facts and inferences in a light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, only disputes over those facts "that might affect the outcome of the suit under

the governing law will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Once the moving party has carried its initial burden of demonstrating the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. No issue for trial exists unless the nonmoving party can adduce sufficient evidence favoring it such that a reasonable jury could return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505.

### DISCUSSION

A. *Breach of Fiduciary Duties for Insufficient Notice of Termination of Benefits*

Plaintiffs assert a breach of fiduciary duty claim against the Defendant Benefit Fund in Count Two of the Fourth Amended Complaint. In particular, according to Plaintiffs, it was the duty of the Fund to notify Plaintiffs of the failure of United Hospital to make its monthly contributions prior to terminating Plaintiffs' health benefits. The Fund's failure to provide notice constitutes a breach of the Fund's fiduciary duty to its members.

The Defendant Fund argues that it complied with its fiduciary duties by promptly submitting the matter of the delinquent contributions to arbitration and receiving an award. Accordingly, the Fund owed no additional obligations to the Plaintiffs with respect to the employer's delinquencies. *See* Defendants' Brief, dated September 13, 1999, at pp. 5–6. The Court recognizes that in addition to submitting the matter to arbitration, the Fund pursued the delin-

---

1. The collective bargaining agreement stipulated that if the employer failed to make its monthly payment, a "prompt arbitration" would be scheduled. *See* Plaintiffs' Exhibit 1, at p. 47.

quent contributions against United Hospital in the bankruptcy court. In the alternative, Defendants assert that "at most [there] is an approximately 30–day delay informing members that their benefits had ceased as of November 30, 1996." Defendants' Brief, dated February 5, 2003, at p. 9. Despite this delay, Defendants argue that "no prejudice was caused by the Fund relying on its unwritten practice of allowing an employer an additional month in which to make a payment." *Id.*

Under ERISA, "a person is a fiduciary with respect to a plan to the extent that he exercises any discretionary authority or discretionary control respecting management of such plan[.]" 29 U.S.C.A. § 1002(21)(A).[2] A plan participant or beneficiary may bring an action for a breach of fiduciary duty against the plan, its administrators or trustees under 29 U.S.C.A. § 1132(a)(3). *Bixler v. Central Penn. Teamsters Health & Welfare Fund,* 12 F.3d 1292, 1299–1300 (3d Cir.1993) (allowing for individual recovery for breach of fiduciary duties under Section 502(a)(3) of ERISA). A "prudent man standard of care" requires a fiduciary of a benefit plan to:

> discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—

(A) for the exclusive purpose of:

(i) providing benefits to participants and their beneficiaries; ...

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; ...

(D) in accordance with the documents and instruments governing the plan ...

29 U.S.C.A. § 1104(a). Because the statute "does not enumerate or elaborate in any detail on the duties owed by a fiduciary to a plan beneficiary," courts have therefore "been called upon to define the scope of a fiduciary's responsibilities." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 278 (2nd Cir.), *cert. denied,* 519 U.S. 931, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996); *see also Bixler,* 12 F.3d at 1299 ("Congress relied upon the common law of trusts to 'define the general scope of [trustees' and other fiduciaries'] authority and responsibility.' ")(*quoting Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc.,* 472 U.S. 559, 570, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985)).[3]

**2.** ERISA defines a "person" as an "individual, partnership, joint venture, corporation, mutual company, joint-stock company, *trust,* estate, unincorporated organization, association, or employee organization." 29 U.S.C. § 1002(9) (emphasis added).

**3.** The Agreement and Declaration of Trust between the Union and the participating employers incorporates the "prudent man" standard of care as applicable to the Trustees' conduct:

> The Trustees shall exercise the powers granted herein:
> (a) solely in the interest of the Employees, Participants, Beneficiaries and eligible dependents; (b) for the exclusive purpose of providing benefits to Employees, Partici-

pants and Beneficiaries and defraying reasonable expenses of administering the Trust and the Plans; (c) with the care, skill, prudence and diligence, which under the circumstances then prevailing, a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims....

Plaintiffs' Exhibit 2, at pp. 23–24. The Agreement also provided that the Trustees may "delegate any of their powers or duties hereunder to any of their consultants, agents, employees, or one or more of the Trustees." *Id.* at p. 25. Plaintiffs seek to hold the Defendant Fund liable through the actions of its Trustees and agents, including the Director, who exer-

In support of their argument that the Defendant Fund breached its fiduciary obligations, Plaintiffs rely on a series of cases where Courts have found that fiduciaries have a duty under ERISA to notify employees of an employer's failure to make the monthly contributions to pension funds as mandated by the pension or trust agreement. In *Rosen v. Hotel and Restaurant Employees & Bartenders Union*, 637 F.2d 592 (3d Cir.1981), the Third Circuit addressed the obligations of the trustees of a union pension fund in connection with delinquent employer contributions. The Court stated that "[a]t a minimum, the fiduciary obligations of a pension fund trustee require that he notify the pensioner of his employer's failure to contribute as required by the agreement." *Id.* at 599–600. In reaching this conclusion, the Court noted that "[c]ontinued eligibility is the core of the trustee beneficiary relationship and those responsible for the administration of the fund are required to notify pensioners when their employer jeopardizes their eligibility." *Id.* at 600. *See also Professional Helicopter Pilots Assoc. v. Denison*, 804 F.Supp. 1447, 1454–55 (M.D.Ala.1992) (finding that fiduciaries breached their obligations when they failed to make any effort to notify participants that their employer was not depositing contributions to the pension fund); *Pension Benefit Guar. Corp. v. Solmsen*, 671 F.Supp. 938, 946 (E.D.N.Y.1987) (finding that a fiduciary who failed to forward employee contributions to the pension trust and who failed to notify employees that their contributions had not been forwarded breached his statutory duties).

The *Rosen* Court cited with approval traditional trust principles, which Courts employ to inform their interpretations of ERISA fiduciary responsibilities. *See Ream v. Frey*, 107 F.3d 147, 153 (3d Cir.

1997)("A fiduciary's duties under ERISA are based on ERISA, particularly the prudent person standard as set forth in ERISA § 404, 29 U.S.C. § 1104, and on the common law of trusts."). Under trust law, there is a:

> d. *Duty in the absence of a request by the beneficiary.* Even if the trustee is not dealing with the beneficiary or the trustee's own account, a trustee is under a duty to communicate to the beneficiary material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection in dealing with a third person with respect to his interest.

Restatement (Second) of Trusts, § 173, Comment b, (1959)(*quoted in Rosen*, 637 F.2d at 600 n. 11). The Third Circuit has expounded on the concept of materiality with respect to an ERISA fiduciary's alleged misrepresentations or omissions. In *Jordan v. Federal Express Corp.*, 116 F.3d 1005 (3d Cir.1997), the plaintiff claimed that the plan administrator breached its fiduciary obligations when it failed to notify plaintiff of the irrevocability of his retirement benefit election and joint annuitant designation. The Court reiterated a prior conclusion that a fiduciary's duty to inform " 'entails not only a negative duty not to misinform, but also an affirmative duty to inform when the trustee knows that silence may be harmful.' " *Id.* at 1015 (*quoting Bixler*, 12 F.3d at 1300). On the issue of materiality, the Court found that an omission "may rise to a material level" " 'if there is a substantial likelihood that it would mislead a reasonable employee in making an adequately informed retirement decision.' " *Jordan*, 116 F.3d at 1015–16 (*quoting In re Unisys Corp. Retiree Litig.*, 57 F.3d 1255, 1264 (3d Cir.1995)).

cised discretionary authority over the management of the Fund.

In the present case, it is clear from the evidence submitted that United Hospital failed to pay its December, 1996 contribution to the Benefit Fund.[4] The Summary Plan Description states that generally, member benefits will terminate 30 days after the date that, among other things, the "employer discontinues contributions to the Fund based on your employment." Plaintiffs' Exhibit 4, at p. 36.[5] After the employer failed to make the December contribution, the Fund promptly exercised its right to arbitrate the matter. These facts reveal that the Defendant Fund was aware that member benefits were in jeopardy as of December 30, 1996. In addition, it is undisputed that the Fund made no effort to notify Plaintiffs that their benefits would terminate thirty days after the employer discontinued its contribution to the Fund. The February 4, 1997, letter was the first announcement to the members that their benefits had been compromised by the Hospital's delinquencies.

*See* Plaintiffs' Statement of Facts, at ¶ 37; Defendants' Response, at ¶ 37.

Given the principles articulated in *Rosen* and under trust law, the Court disagrees with Defendants' assertions that the Benefits Fund's fiduciary responsibilities extended only to its duty to proceed with an arbitration for the delinquent contributions and that the members suffered no prejudice by the delay in providing notice of the employer delinquency. The core of a fiduciary's obligation under ERISA is to administer a benefit plan in the interests of the beneficiaries and members. In this case, members benefits were jeopardized on December 30, 1996, the deadline for the December contribution. Without any advance notice of termination of eligibility for benefits, the Plaintiffs had no opportunity to arrange for other insurance coverage or to prepare to live without coverage. In this respect, the information that the Fund failed to provide was material to the interests of the Union members and beneficiaries.[6] Accordingly, the Court finds that

---

4. The Court observes that Defendants have presented somewhat confusing and contradictory interpretations of the provision in the collective bargaining agreement that explains the framework for the employer's monthly contributions. For example, Joseph Carpenter states that "payments to the Funds for coverage for employees for December 1996 were not due until the end of January 1997." Carpenter Certification, at ¶ 7. Carpenter then notes that the Fund did not know, prior to midnight, January 31, 1997, that the December contribution was due and that it had not been paid. *See id.* at ¶ 10.

This interpretation is repeated in the Fund's September 13, 1999 Brief. In their response to Plaintiffs' Statement of Facts, however, Defendants agree that the December contribution became due on December 30, 1996. *See* Response to Plaintiffs' Rule 56.1 Counterstatement of Facts, at ¶ 35. The Court finds that under the terms of the collective bargaining agreement, the deadline for payment of the December contribution was December 30, 1996. The Carpenter Certification cannot be

credited with providing an accurate description of the payment framework.

5. The parties disagree whether the Fund should be bound by the terms of the SPD, the ERISA Plan (Plaintiffs' Exhibit 3), or some other alleged Plan document (Carpenter Certification, Exhibit C). Despite this disagreement, there is no dispute that the Fund referred to the SPD (and perhaps other documents) when determining members' eligibility for benefits. Moreover, the parties agree that the SPD was in effect at all times relevant to the events in this case. *See* Plaintiffs' Stmt. of Facts, at ¶ 32. The SPD provision cited by the Court underscores the Fund's recognition that member benefits would be terminated if an employer ceased making contributions.

6. Plaintiffs have submitted copies of lead plaintiff Lucy Martinez's medical bills that accrued during the period December 1, 1996 through February 4, 1997, thus establishing that the lead plaintiff suffered a material detriment as a result of the lack of notice.

the Fund's failure to provide Plaintiffs with any notice of termination of eligibility for benefits does not comport with Fund's fiduciary obligations to keep members informed of materially relevant information.

Furthermore, the Court concludes that the date that the Fund terminated member benefits—December 1, 1996—finds no authority in any of the Fund documents, and is contrary to the language in the Summary Plan Description, which provides that benefits will terminate thirty days after the employer discontinues its contributions to the Fund. The deadline for the December contribution—December 30, 1996—is the date on which the employer ceased to make its contribution to the Fund. Thus, member benefits should have terminated thirty days after December 30, 1996. Pursuant to the "prudent man" standard of care, the Fund was obligated to provide notice to its member on January 1, 1997, or shortly thereafter, that eligibility for members benefits was in jeopardy, and that benefits would be terminated on January 31, 1997, unless the employer cured its delinquency.

For the reasons set forth above, the Court grants Plaintiffs' cross-motion for summary judgment on liability against the Defendant Fund on the breach of fiduciary duty claim. Specifically, the Court finds that the Fund breached its duties by failing to provide Plaintiffs appropriate notice of termination of eligibility for benefits and by terminating Plaintiffs' benefits retroactively. Accordingly, the Court concludes that Plaintiffs are entitled to health benefit coverage through the period ending February 4, 1997.

## B. Direct Payment Coverage

■ The Plaintiffs argue that the Defendant Fund improperly denied "direct payment coverage" to Plaintiffs in violation of the ERISA Plan. In support of this argument, Plaintiffs rely on a document that they identify as the controlling "ERISA Plan Document." This document contains the following provision:

Members and their dependents may have coverage terminated or reduced for the reasons described in the following section (12.1B). When such coverage terminates or is reduced, Members and/or their Eligible Dependents may continue certain Benefits by making payment directly to the Fund. The Fund publishes a brochure listing Direct Payment Benefits available and the corresponding charges.

Plaintiffs' Exhibit 3, at p. 98. Section 12.1B of the document states that "members who are no longer covered through a contributing employer" are eligible for "direct payment." *Id.* The Defendant Fund counters that the document which contains a reference to "direct payment coverage" is not a plan document or the ERISA Plan for the New Jersey 1199J Benefit Fund, and thus direct payment coverage is not a benefit which the Fund offers its members or to which Plaintiffs are entitled. The Summary Plan Description does not contain any reference to "direct payment coverage."

ERISA requires that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C.A. 1102(a). Prior to the 1997 Amendments, ERISA identified "plan descriptions" and "summary plan descriptions" as pertinent documents that govern the operation of the plan.[7] At all times,

7. Public Law 105–34 of August 5, 1997 eliminated the "plan description" requirement from 29 U.S.C.A. § 1102 and from other statutory provisions governing the types of documents under which an ERISA Plan operates. The House Conference Report of July 30, 1997, reveals that this change was enacted to

ERISA has required that a summary plan description "be written in a manner calculated to be understood by the average plan participant, and shall be sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C.A. § 1022(a). At the time that this cause of action arose, ERISA mandated that both the summary plan description and the plan description contain, among other things, eligibility requirements and circumstances that would cause the termination of benefits.

In the present case, as a threshold matter, the Court must determine whether Plaintiffs' Exhibit 3—the alleged controlling written "ERISA Plan"—is a "written instrument" that governs the operation of the 1199J New Jersey Benefit Fund. According to Plaintiffs, the alleged "ERISA Plan" that contains the provision for direct payment coverage was adopted in 1991 by the New Jersey 1199J Fund and was in effect from 1991 through 1996. *See* Plaintiffs' Stmt. of Facts, at ¶ 28. Plaintiffs draw this conclusion about the status of the alleged ERISA Plan from Joseph Carpenter's deposition testimony and from a cover letter that the Defendant Fund sent to the Fund's Third–Party Administrator, Magnacare, on July 30, 1996. *See id.* This letter, signed by Assistant Director Patricia Barnes, is written on Fund stationery and states "[a]s per your request at today's meeting enclosed is the Plan Document for the Benefit Fund." Plaintiffs' Exhibit 3. When asked about the

document attached to the cover letter, Carpenter responded that it was the "plan document that had come from New York from '91, which was a summary of everything that was under the plan at that time ... we were in the process of writing our own, so this was the one that we were working from." Carpenter Dep., at p. 43.[8] When asked if this plan document was in effect in July of 1996, Carpenter responded in the affirmative (*id.*), but later stated that the plan document was used as a "guide" *Id.* at p. 52. According to Carpenter, the Summary Plan Description, and not the document identified by Plaintiffs as the "written ERISA Plan," contained the complete descriptions of the benefits offered to New Jersey 1199J Benefit Fund members. *See id.* at pp. 55, 61.[9]

Carpenter's testimony is inconsistent as to whether or not the document attached to the July 30, 1996, letter to Magnacare is the "ERISA Plan" for the 1199J New Jersey Benefit Fund. Thus, the Court cannot credit Carpenter's testimony as providing a basis to find that Plaintiffs' Exhibit 3 is the "ERISA Plan" for the New Jersey Benefit Fund. Moreover, because the record does not include any documentary evidence from Patricia Barnes about the Magnacare letter, the Court cannot rely upon the letter as conclusively establishing that Plaintiffs' Exhibit 3 is the ERISA Plan document for the Defendant Fund.

Upon close examination of the document itself, the Court is not persuaded that the alleged "written ERISA Plan" (Plaintiffs'

---

eliminate burdensome paperwork requirements for pension and welfare plans.

**8.** The New Jersey 1199J Benefit Fund apparently separated from the National Fund in or around 1991 in order to establish itself on its own.

**9.** As noted in the previous section, attached to the Carpenter Certification is a document en-

titled "District 1199J New Jersey Benefit Plan Draft of October 3, 1994." Upon inquiry in his deposition, Carpenter testified inconclusively about the status of this document as a "plan that was in effect for 1199J," stating that the document was a "draft" of a prior document, but that the SPD was the guide that the Fund used in determining member benefits. *See* Carpenter Dep., at p. 60.

Exhibit 3) is a written instrument that defines the benefits available to members of the New Jersey 1199J Benefit Fund. As stated in its Introduction, Plaintiffs' Exhibit 3 governs the National Benefit Fund for Hospital and Health Care Employees. By comparison, the first page of the Summary Plan Description states that it is the SPD of the District 1199J New Jersey Benefit Fund. Furthermore, the dates upon which each document was in effect are probative of the status of each document. The date of the SPD, September 1, 1993, shows that it was created subsequent to the inception of the New Jersey Fund, which was started in 1991. The SPD thus appears to supercede the September 1, 1981 "ERISA Plan." Plaintiffs have not submitted any conclusive evidence to establish that the Trustees of the 1199J New Jersey Benefit Fund adopted the September 1, 1981, ERISA Plan at any time. Under these circumstances, the Court cannot conclude that Plaintiffs' Exhibit 3 constitutes a written instrument for the New Jersey 1199J Benefit Fund.

The Court is also mindful that there is no conclusive evidence in the record that "direct payment coverage" had ever been offered to the Fund's participants or beneficiaries, or that any document or brochure describing "direct payment coverage" was ever distributed to any member. In this regard, there is no evidence or argument that the Defendant Fund made any representations regarding the availability of "direct payment coverage" to its members. Under all of these circumstances, the Court is not persuaded by Plaintiffs' evidence that the "ERISA Plan" (Plaintiffs' Exhibit 3) applies to the type of benefits to which members of the New Jersey 1199J

Benefit Fund are entitled. Accordingly, because it cannot be said that there is any issue of material fact regarding whether Plaintiffs are entitled to direct payment coverage, the Defendant Fund's motion for summary judgment on this issue is granted.

### C. Insurance Coverage for Unemployed Members

 Plaintiffs argue that the Defendant Fund's decision to deny members insurance coverage during their periods of unemployment, as provided in the Summary Plan Description, was arbitrary and capricious.[10] The relevant SPD provision is as follows:

> Unemployed members who are receiving State Unemployment Insurance Benefits who were covered by this Fund immediately prior to qualifying for Unemployment Insurance Benefits will continue to be covered while receiving Unemployment Insurance. Such extended coverage will be continued for one month for each full year of prior coverage by the Fund, up to a maximum of six months of consecutive Unemployment Insurance eligibility.

Plaintiffs' Exhibit 4, at p. 15. Defendants argue that under the plain language of this provision, Plaintiffs were not "covered" by the Benefit Fund at the time of their unemployment, and thus they are not entitled to extended health benefit coverage.

 Courts reviewing denials of benefits under ERISA are restricted to an "arbitrary and capricious" standard of review in situations where the trustee has been afforded discretion to interpret the

---

**10.** Plaintiffs indicate that the "ERISA Plan" (Plaintiffs' Exhibit 3) also contains a provision extending health benefits to members during periods of unemployment. Because the Court has concluded that Plaintiffs' Exhibit 3 is not a document that governs the benefits for the New Jersey Fund, the Court will not consider the provision in Exhibit 3 in its analysis of whether Plaintiffs are entitled to unemployment benefit coverage.

terms of the plan or to determine eligibility requirements. *See Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). In the present case, the Summary Plan Description grants the Trustees discretion "to interpret the terms of this Plan (including, but not limited to, questions concerning eligibility determinations). The trustees decision or actions in good faith shall be conclusive and binding upon all participants[.]" Plaintiffs' Exhibit 4, at "A Message From the Board of Trustees."

 Plaintiffs argue that in this case a heightened "sliding scale" standard of review applies because the Fund is operating under a conflict of interest as articulated in *Pinto v. Reliance Standard Life Ins. Co.,* 214 F.3d 377 (3d Cir.2000). Plaintiffs, however, have not put forward sufficient evidence of the Fund's alleged conflicts. The Defendant Fund is a non-profit Taft–Hartley multiemployer Fund, and thus none of the Trustees or the Director have a personal economic interest in the decisions to deny or provide benefits to members. In short, the profit motive is absent from this set of circumstances, and Plaintiff has not set forth any facts or evidence to suggest otherwise. Thus, the Court will not apply the *Pinto* heightened standard of review. Rather, under the deferential arbitrary and capricious standard, the Court may overturn the Defendant Fund's decision "only if it is without reason, unsupported by the evidence or erroneous as a matter of law. This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [Trustees] in determining eligibility for plan benefits." *Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 439 (3d Cir.1997) (citations and quotes omitted).

In this case, the primary dispute involves the interpretation of the "immediately prior" requirement for the extension of health benefit coverage during unemployment. Defendants assert that in light of the employer delinquency, Plaintiffs' benefit coverage terminated in December of 1996. As Plaintiffs were not terminated from employment until February, 1997, they were not covered by the Fund "immediately prior" to the commencement of unemployment. Plaintiffs counter that they were still covered by the Fund immediately prior to the start of their periods of unemployment insofar as their benefits had not been terminated but merely were suspended when the employer failed to make its contributions.

As set forth in Section A., *supra,* the Court has concluded that Plaintiffs were eligible for health benefit coverage until January 31, 1997. The Court finds that a reasonable interpretation of the "immediately prior" requirement would not preclude coverage of benefits for employees who were terminated any time during February of 1997. In short, it is reasonable to interpret "immediately prior" to mean closely related in time, which the Court finds would encompass terminations that occurred throughout February of 1997.

"Immediately prior" does not mean that no delay or lapse in time would occur between Plaintiffs' eligibility for health coverage and the day that unemployment begins. A restrictive interpretation would be reasonable only if the provision stated that employees must be covered by the Fund *at the time* that they were terminated in order to qualify for unemployment health coverage. The provision, however, does not make extended health coverage contingent upon coverage up until the day that unemployment commences. The Court finds that "immediately prior" means that a reasonable amount of time would pass between eligibility for health coverage with the Fund and the start of unemployment. Under the circumstances

of this case, the Court concludes that a one month period of time is a reasonable amount of time. Therefore, all employees terminated in February of 1997, who qualified for and received unemployment insurance benefits, are entitled to health benefit coverage during their periods of unemployment, according to the terms of the provision in the Summary Plan Description.

## D. Cobra Coverage

■ COBRA requires that plan sponsors of group health plans, including multiemployer plans, provide employees and beneficiaries who otherwise would lose health coverage as a result of a "qualifying event" the option to elect continuation coverage. *See* U.S.C.A. § 1161(a). Among other things, a " 'qualifying event' means, with respect to any covered employee, ... (2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment." 29 U.S.C.A. § 1163(2). COBRA defines a "covered employee" as "an individual who is (or was) provided coverage under a group health plan by virtue of the performance of services by the individual for 1 or more persons maintaining the plan." 29 U.S.C.A. § 1167(1). Covered employees and qualified beneficiaries who elect COBRA coverage pay their own premiums at a cost not to exceed 102 percent of the employer's cost. *See* 29 U.S.C.A. § 1162(3). One of the reasons that COBRA coverage is attractive to layed-off or terminated employees is that in general, the group rate is lower than the rate for individual plans.

In the present case, Plaintiffs aver that the Defendant Fund failed to notify the Plaintiffs that they were entitled to elect COBRA coverage upon the qualifying event, which, in this case, was either termination or a reduction in hours on various days throughout February of 1997. Plaintiffs contend that they were entitled to elect COBRA coverage because at the time of their "qualifying events," they were "covered employees," even though their benefits had been suspended due to the employer's delinquencies. Under Plaintiffs' interpretation of the phrase "covered employee," Plaintiffs were entitled to COBRA because they had been covered by the Fund's Plan.

Plaintiffs emphasize that their benefits could have been reinstated once the employer cured its delinquencies, and thus their benefits were merely "suspended" as of date of the qualifying event. However, this characterization of the status of their benefits does not change the undisputed *fact* that Plaintiffs' were not covered by the plan in February of 1997, when the terminations or reductions in hours occurred. As noted in Section A., Plaintiffs were entitled to benefit coverage until January 31, 1997. After this date, however, Plaintiffs were not eligible for benefits because their employer had not cured the delinquencies. Thus, the lack of coverage under the Plan at the time of the Plaintiffs' "qualifying events" places the Plaintiffs outside of the statutory definition of "covered employees." Indeed, the Fund's duty to provide COBRA continuation coverage extends only to United Hospital employees who were covered by the plan on the date of their qualifying events.

The Court concludes that the Defendant Fund did not have a duty to provide COBRA to the Plaintiffs and thus summary judgment is granted in favor of the Defendant Fund.

## E. Duty of Fair Representation

■ A labor union has a duty of fair representation "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and

to avoid arbitrary conduct." *Vaca v. Sipes*, 386 U.S. 171, 177, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967). "A breach of the statutory duty of fair representation occurs … when a union's conduct towards a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.* at 190, 87 S.Ct. 903. The Supreme Court has explained that the duty of fair representation exists because the National Labor Relations Act deprives "individuals in the [collective bargaining] unit of a the ability to bargain individually or to select a minority union as their representative" and thus the duty ensures that individuals are not "deprived of all effective means of protecting their own interests." *DelCostello v. International Bhd. of Teamsters*, 462 U.S. 151, 164 n. 14, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). Put differently, the duty of fair representation is a "bulwark to prevent arbitrary union conduct against individuals stripped of traditional forms of redress by the provisions of federal labor law." *Vaca* 386 U.S. at 182, 87 S.Ct. 903.

■ In the present case, Plaintiffs argue that the Union breached its duty of fair representation by failing to provide notice to members of the employer's delinquencies and of the Defendant Fund's policy of retroactive termination of benefits. To support their claims, Plaintiffs contend that the Union, through the Union Trustees of the Benefit Fund, were aware of the employer's delinquencies and the Fund's retroactive termination policy, yet failed to inform members that health benefits had been jeopardized or cancelled. The Defendant Union denies these allegations (*see* Defendants' Response to Plaintiffs' Stmt. of Facts, at ¶ 52), claiming that under the circumstances of the employer's bankruptcy, the Union fulfilled its duty to its members through a host of activities including holding informational meetings at the hospital, distributing flyers, and providing written notices of the hospital's status. *See* Certification of Joseph Franklin, at ¶¶ 6–8. In short, the Union asks "what else could it have done?" *See* Defendants' Brief, dated February 5, 2003., at p. 13.

Because the Fund and the Union are two separate entities, the Fund's conduct is not necessarily attributable to the defendant Union. As noted previously, pursuant to the Declaration of Trust, half of the Trustees of the Benefit Fund were selected by the Union and half by the contributing employers. Plaintiffs do not suggest, and the evidence does not demonstrate, that either the Union Trustees or the Management Trustees were involved with the daily management and administration of the Fund. Rather, the Fund's Director, who is employed by the Trust, administered and managed the Fund on a daily basis (*see* Plaintiffs' Exhibit 2, at pp. 24–25), and the Trustees met periodically or were polled in order to establish general policies for the Fund. *See id.* at p. 13. The Fund's Director was not associated with the Union. *See* Plaintiffs' Exhibit 10, Deposition of Joseph Franklin ("Franklin Dep."), at p. 8. Thus, under these circumstances, it is the knowledge that the Union Trustees had of the delinquencies and the termination policies that is material to Plaintiffs' theory of the Union's liability in this case.

In their brief, Plaintiffs refer generally to the Union's knowledge of the Fund's policies and the employer's delinquencies. As evidence of the Union's knowledge, Plaintiffs point to the deposition testimony of Joseph Franklin, who at time of the events in question was a Union Trustee of the Benefit Fund and the Secretary/Treasurer of the Union. In relevant part, Franklin stated it was "November or December that [he] became aware that there was some delinquency [at United Hospi-

tal]." Franklin Dep., at p. 33.[11] When he was asked about the Fund's delinquency policy, Franklin responded that "if the institution was late in making payment, there would be an immediate arbitration, and at some point in time, ... if the payment was not received, then benefits were cut off." *Id.* at p. 42. The testimony before the Court does not indicate specifically whether Franklin was aware of the verbal retroactive termination policy which Carpenter discussed in his deposition.[12] Moreover, Plaintiffs' assert that the Fund went forward with the arbitration without notifying the Board of Trustees, which implies that the Fund did not discuss the delinquent status of United Hospital's contributions with the individual Trustees. *See* Plaintiffs' Stmt. of Facts, at ¶ 36. The minutes of the April 18, 1997, Board of Trustees meeting, which occurred well after benefits were terminated, report that the retroactive termination policy was discussed, and that Carpenter suggested that in the future, prior termination notices should be sent to members. *See* Plaintiffs' Exhibit 9, at pp. 3–4.

Given the evidence set forth by Plaintiffs, the Court cannot say that a factfinder could conclude that Franklin, other Union Trustees, or the Union had knowledge that the employer delinquencies had jeopardized member benefits *and* that the Fund

was poised to enact its retroactive termination policy. The Court cannot infer from Franklin's assertion that he was aware of "some delinquency" that the Union was also aware that member benefits were to be terminated retroactively without prior notice. Moreover, while Carpenter testified to the existence of the retroactive termination policy, Plaintiffs have not set forth evidence of the Trustees' knowledge of the implementation of this policy in this case.[13] In this respect, the Defendant Fund may be faulted for failing to call a Board of Trustees meeting prior to the Fund's decision to terminate member benefits. However, there is not sufficient evidence in the record from which a factfinder could infer that the Union was aware of the employer delinquencies, the jeopardized status of member benefits, and application of the retroactive termination policy.

Accordingly, the Court grants the Defendant Union's motion for summary judgment on Plaintiffs' claim that the Union breached its duty of fair representation.

### CONCLUSION

The Court grants summary judgment in favor of Plaintiffs on their claim that the Defendant Benefit Fund breached its fiduciary duties. The Court also grants summary judgment in favor of Plaintiffs on

---

11. The evidence before the Court does not indicate how Franklin became aware of the delinquencies. It appears that a Board of Trustees meeting, which was not attended by Franklin, occurred on November 27, 1996. The minutes of that meeting do not show that United Hospital was discussed. There is no evidence in the record that another Board of Trustees meeting was held prior to the meeting of April 18, 1997. *See* Plaintiffs' Exhibit 9.

12. The deposition testimony of the other Benefit Fund Trustees that is before the Court does not refer to the verbal policy of retroactive termination.

13. When asked if he polled the Trustee with respect to any decision made in connection with interpreting the Plan as it applied to United Hospital employees, Carpenter responded in the negative. *See* Carpenter Dep. at pp. 32–33. Carpenter qualified this stance by stating that prior to sending out the letter to members informing them that their benefits were terminated retroactive to December 1, 1996, he "thinks" that he "polled the Trustees to let them know what was going on." Carpenter Dep. at p. 33. Franklin's testimony contains no information on whether he was polled about the letter.

their claim for unemployment continuation coverage as provided in the Summary Plan Description.

The Court grants summary judgment in favor of the Defendant Fund on Plaintiffs' COBRA coverage and direct payment coverage claims. In addition, the Court grants summary judgment in favor of the Defendant Union on Plaintiffs' claim for breach of the duty of fair representation.

To the extent that Plaintiffs have asserted any state law claims for negligence or breach of contract against the Defendant Fund and the Defendant Union, those claims are pre-empted by ERISA, and thus are dismissed. Moreover, Plaintiffs have not asserted any claims against the 1199J Pension Fund, which is named as a Defendant, and thus the Pension Fund is dismissed from this action.